# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48993-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| BRANDON CHRISTOPHER BARNES, | |
| Appellant. | |

MAXA, C.J. — Brandon Barnes appeals his conviction for first degree rape of a child and the trial court's imposition of certain community custody conditions.

We hold that (1) Barnes's claims regarding the imposition of bail and the amount of bail are moot; (2) the trial court did not err in entering a protective order restricting Barnes's use and dissemination of the victim's recorded forensic interview; (3) the trial court did not err in finding that the five-year-old victim, TV, was competent to testify; (4) the trial court did not err in admitting TV's statements to various people under the child hearsay statute; (5) the prosecutor did not engage in misconduct regarding the State's burden of proof; (6) the community custody condition prohibiting Barnes from frequenting places where children congregate is unconstitutionally vague; and (7) two other community custody provisions are invalid and a third is invalid in part because they are not crime related.

Accordingly, we affirm Barnes's conviction, but we remand with instructions to strike community custody conditions 16, 24, 28 and a portion of 29 in accordance with this opinion.

FACTS

From September to December of 2014, four-year-old TV lived with her grandmother, Francesca Heard. Various family members also helped care for TV, including TV's second cousin Sonya Jones and Heard's boyfriend's mother, Darlene Quins. During this time, TV's mother, Keshia,[1] was in the process of relocating to Nevada.

TV also spent time at the home of another second cousin, Tahjiere Smith, who lived with her boyfriend, Barnes. In November, Heard went out of town for the weekend and TV spent the weekend with Smith and Barnes.

Later that week, after Heard had returned, TV told Jones that she was sad because Barnes "did something to her." 5 Report of Proceedings (RP) at 437. TV told Jones that while she stayed with Barnes and Smith, Barnes called her into his and Smith's bedroom, started to take off her underwear, laid TV on the ground, and touched TV in the vaginal region of her body. TV said that she tried to scream, but Barnes covered her mouth with his hand. According to TV, Barnes lay on top of her and moved up and down.

After this disclosure, Jones took TV to Heard, who went with TV into a separate room to talk without Jones present. TV told Heard that Barnes took TV into his bedroom, told her to lie down on her stomach, and pulled down her panties, and that Barnes laid on top of her. TV also said that she wanted to get up, but Barnes would not let her. Heard asked TV if she was telling the truth and TV said that she was. Heard reported TV's disclosure to the police.

TV later made disclosures regarding the abuse to Keshia and Quins.

---

[1] We refer to Keshia by her first name to protect TV's privacy. We intend no disrespect.

*Imposition of Bail*

The State charged Barnes with two counts of first degree rape of a child. After Barnes was arrested, the trial court set bail in the amount of $100,000. Barnes later filed a motion to reduce his bail amount, and the trial court reduced bail to $50,000.

*Protective Order Regarding TV's Forensic Interview*

On December 1, Patricia Mahaulu-Stephens of the Child Advocacy Center conducted a videotaped forensic interview of TV. The State would not provide Barnes with a copy of the recorded interview until he agreed to sign a protective order restricting the dissemination of copies of the recording. Barnes disagreed with the terms of the proposed protective order.

The trial court ruled that there was cause for the protective order because it implicated the privacy of a minor child. The order stated, "Neither the transcript of the recording, nor any portion thereof, shall be divulged to any person not authorized by the terms of this stipulation to review the DVD and/or audio recording." Clerk's Papers (CP) at 187. After both parties signed the order, Barnes received a copy of the recording. At trial, the recording was played in open court for the jury, but was not transcribed for the record.

*Competency/Child Hearsay Hearing*

The State notified Barnes that it intended to introduce TV's hearsay statements at trial pursuant to RCW 9A.44.120. Specifically, the State sought to introduce TV's statements to Jones, Heard, Keshia, Quins, Mahaulu-Stephens, and Michelle Breland, a nurse practitioner who examined TV following her disclosure. The court held a hearing to determine TV's competency to testify and the admissibility of her hearsay statements.

At the hearing, the State questioned TV as to her understanding of the difference between the truth and a lie. TV initially stated that she did not know the difference between telling the

truth and telling a lie. But then she said that her teacher told her not to lie and that her mother sometimes talked to her about telling the truth and a lie. And TV correctly answered some hypothetical questions that distinguished between the truth and pretend. Finally, she said she would tell the truth and promised not to lie.

TV could not remember living at Heard's house in the fall of 2014, but she recalled that Heard's house was brown and that she had spent the night there in her own bedroom upstairs. She also did not remember talking in a room with cameras about the incident involving Barnes. However, she remembered telling Heard and Jones about what had happened at Barnes's house.

Jones, Heard, Keshia, and Quins, testified about TV's statements to them. Jones asked TV if she was telling a story or telling the truth. TV told Jones, "I'm not telling you a story. I'm telling you the truth." 2 RP at 150. TV also told Heard that she was telling the truth about what happened with Barnes. Keshia testified that she never had any problems with TV lying.

Mahaulu-Stephens testified that during her forensic interview of TV, she asked TV if she would promise to tell the truth and TV said that she would. TV corrected Mahaulu-Stephens if she made errors while talking to TV. TV also asked for clarification when she did not understand something.

The trial court reviewed TV's recorded interview with Mahaulu-Stephens. In the recorded interview, TV described Barnes's "boomerang" as "going in her potty." 3 RP at 247. TV described the feeling as "smooshy or gooey." 3 RP at 247. Mahaulu-Stephens testified that TV's use of this language evidenced a lack of coaching because she was only able to articulate a four year old's understanding of anatomy.

The trial court found that while TV initially had difficulty answering directly whether she understood the difference between the truth and a lie, "she did by examples indicate that she did

have an understanding of the difference between fiction and reality." 3 RP at 287. The court also found that TV "has the understanding and the knowledge of her obligation to speak the truth on the witness stand." 3 RP at 287. Further, based on the forensic interview, the court found that TV demonstrated mental capacity at the time of the occurrence. Specifically, TV was conversant during the interview, paid close attention to the room, and complimented the examiner on her clothing. Compared to her demeanor in court, her demeanor in the interview "indicated she was very grounded at the time." 3 RP at 288. The court also found that TV had sufficient memory to retain independent recollection of the charged incident because she could answer questions related to where she was living, what happened shortly after, when she moved, and whether she was in school or daycare.

The trial court found that there was no reason to question TV's general character nor was there a motive for TV to lie. And the initial disclosure to Jones was spontaneous. There were multiple people who heard TV's statement in a short period of time, TV disclosed the incident to Heard moments after disclosing the incident to Jones, and the forensic interview was set up a week following the initial disclosure. Even though TV made some inconsistent statements, there was some degree of consistency between the two initial disclosures.

Based on the totality of the circumstances, the trial court found that there was no reason to believe that TV misrepresented what she perceived in this case. Therefore, the trial court ruled that TV was competent to testify at trial and TV's child hearsay statements to each of the witnesses were admissible.

*Trial Testimony and Argument*

At trial, Jones, Heard, Keshia, Quins, and Mahaulu-Stephens testified about TV's statements that the trial court had ruled admissible. TV also testified. She stated that the last

5

time she spent the night at Barnes's home, he called her into his room. He then told her to lie down on the floor on her stomach and got on top of her. She was wearing pants and a shirt at the time and her "clothes were halfway off because of him." 5 RP at 410.

Breland, a pediatric nurse practitioner, performed a physical examination of TV. Breland testified that during her examination of TV, TV told her that someone had done something she did not like to her hip, but then pointed to her anal region. TV then described the area as "the part where the pee pee comes out." 6 RP at 615. TV also told Breland that her pants and panties had been taken down.

Throughout closing argument, the State emphasized that the jurors were the sole judges of credibility. The State argued that the evidence in this case was TV's words. The State also argued, "[i]f you believe [TV's] words, if you believe her description of what happened to her, what the defendant did to her, you are convinced beyond a reasonable doubt." 7 RP at 761.

The State also emphasized that TV had "absolutely no motive to fabricate what happened to her" and that there was "no evidence before you, none presented, to suggest a reason why she would." 7 RP at 750. Barnes objected to this statement as shifting the burden of proof. The State then argued that there was no evidence that any of the other witnesses fabricated their testimony. Barnes again objected that these statements were shifting the burden.

Barnes argued in closing that Heard coached TV into disclosing the abuse. He also argued that the circumstantial evidence suggested animosity between Heard and Keshia, which prompted the coaching.

The State addressed Barnes's theory of coaching in rebuttal, stating, "There's nothing to support that. Not a shred of actual evidence to support that." Later, the State argued:

> Everything that was talked [about] in defense counsel's argument and all of the
> evidence presented at trial does not support this. There simply is no evidence to

> support that. There is no evidence that [TV] was actually, in fact, coached and no evidence that would suggest [] Heard did this. There is nothing tying her to her being mad and wanting to seek revenge against [Barnes] and [Smith]. It doesn't make any sense.

7 RP at 803.

*Conviction and Sentence*

The jury found Barnes guilty of one count first degree rape of a child and not guilty on the other count. As part of Barnes's sentence, the trial court imposed several community custody conditions.

Barnes appeals his conviction and the imposition of certain community custody conditions.

## ANALYSIS

A.   IMPOSITION OF BAIL

Barnes assigns error to the trial court's initial imposition of bail at $100,000, as well as the court's subsequent reduction of bail to $50,000. He argues that the trial court failed to apply the presumption of release in noncapital cases. He also claims that the bail amounts were excessive and in violation of the Eighth Amendment. We decline to address these arguments because they are moot.

An issue is moot if we can no longer provide effective relief. *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995). We generally do not consider questions that are purely academic. *Id.* at 616-17. But we may consider a moot issue if it involves matters of continuing and substantial public interest. *State v. Cruz*, 189 Wn.2d 588, 598, 404 P.3d 70 (2017). In determining whether a case presents an issue of continuing and substantial public interest, we consider (1) the public or private nature of the issue, (2) whether guidance for public officers on the issue is desirable, and (3) the likelihood that the issue will recur. *Id.*

The relief that Barnes requests here is for us to hold that the initial $100,000 bail was excessive and to hold that the trial court erred in failing to apply the presumption of release in imposing bail. But we cannot grant effective relief regarding the bail imposed because the trial court granted Barnes's request to lower the initial $100,000 bail and Barnes subsequently posted the lowered bail amount. Therefore, this issue is moot.

Barnes argues that the imposition of bail in his case represents a matter of continuing and substantial public interest because of the significant impact of pretrial detention on the accused. However, his challenge here is based on the specific circumstances of his imposed bail amount; his criminal history, ties to the community, and financial need. And the amount of bail imposed is left to the discretion of the trial court. *State v. Reese*, 15 Wn. App. 619, 620, 550 P.2d 1179 (1976). Barnes fails to show that the discretionary imposition of bail here based on the specific circumstances of his criminal history, ties to the community, and likelihood of complying with court orders represents a matter of continuing and substantial public interest.

We decline to address Barnes's moot arguments regarding the imposition of bail.

B.    PROTECTIVE ORDER FOR TV'S FORENSIC INTERVIEW

Barnes argues that the trial court erred in entering the protective order restricting his use and dissemination of the video copy of TV's forensic interview. He claims that such restriction on his use of the evidence violated (1) discovery rule CrR 4.7(a), (2) his constitutional right to an open and public trial, and (3) the required procedure for sealing court records. We reject each of these arguments.

1.    Violation of Discovery Rules

CrR 4.7(a)(1)(ii) states, "*Except as otherwise provided by protective orders . . .* the prosecuting attorney shall disclose to the defendant . . . any written or recorded statements" of

witnesses the State intends to call at trial. (Emphasis added.) The purpose of this disclosure requirement is to ensure the defendant has meaningful access to the evidence supporting the criminal charges. *State v. Boyd*, 160 Wn.2d 424, 432, 158 P.3d 54 (2007). Such access allows the defense to effectively prepare for trial and the defendant to be provided adequate representation. *Id.* CrR 4.7(a) obliges the prosecutor to provide copies of evidence "[w]here the nature of the case is such that copies are necessary in order that defense counsel can fulfill this critical role." *Id.* at 435.

Barnes relies on *Boyd* to argue that the protective order here limited his right to meaningfully access the video recording and thereby violated his right to effective assistance of counsel. But here, the State did provide Barnes a copy of the forensic interview of TV. Therefore, contrary to Barnes's assertion, the State did not fail to produce required material under the rules of discovery.

Further, the Supreme Court in *Boyd* specifically upheld a protective order restricting the use and dissemination of evidence that was similar to the order at issue here. 160 Wn.2d at 439. The court reasoned that CrR 4.7(a) explicitly provides for disclosure of evidence subject to protective orders. *Id.* at 438. The court held, "In cases such as these, safeguarding the interests of the victims requires conditions that account for the ease with which the evidence can be disseminated." *Id.* A protective order limiting the dissemination and use of such evidence protects the victim and "also safeguards the defendant's interests." *Id.* at 439.

Like the protective order in *Boyd*, the protective order here provided defense counsel ongoing access to the copied recording before and during trial, allowed for access by defense expert, and permitted defense counsel to review the evidence with Barnes. Therefore, Barnes's CrR 4.7(a) argument fails.

2.    Constitutional Right to Open Courts

Article I, section 22 of the Washington Constitution guarantees a criminal defendant the right to a public trial. *State v. Love*, 183 Wn.2d 598, 604, 354 P.3d 841 (2015), *cert. denied* 136 S. Ct. 1524 (2016). And article I, section 10 of the Washington Constitution guarantees the public that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." These constitutional provisions assure fairness of our judicial system, and are collectively referred to as the "public trial right." *Love*, 183 Wn.2d at 605. We review public trial right claims de novo. *Id.* at 604.

We apply a three-step analysis in assessing a claimed violation of public trial rights: (1) whether the public trial right attaches to the proceeding at issue; (2) if the right attaches, whether the courtroom was closed; and (3) whether such closure was justified. *Id.* at 605. "The appellant carries the burden on the first two steps; the proponent of the closure carries the third." *Id.*

Here, Barnes appears to argue that his constitutional right to an open and public trial was violated because the forensic recording of TV was played in public court but not transcribed. He also argues that in issuing the protective order, the trial court expressed a belief that it was proper to automatically exclude the public from access to such materials.

However, Barnes presents no argument explaining how the issuance of a protective order limiting dissemination of a forensic interview during discovery closed the courtroom to public access. And the record shows that TV's interview recording was played during trial in open court. Barnes does not provide argument or citation to authority to support his claim that the failure of the trial court to transcribe the video recording in the record rendered the courtroom closed for purposes of the public trial right. Because Barnes has failed to show that the

courtroom was closed to the public during this proceeding, he has failed to meet his burden to show a public trial violation. Therefore, Barnes's argument fails.

        3.    Sealing of Forensic Interview Pursuant to GR 15

GR 15(a) "sets forth a uniform procedure for the destruction, sealing, and redaction of court records." Sealing a record pursuant to GR 15 "means to protect from examination by the public and unauthorized court personnel." GR 15(b)(4). A party in a criminal proceeding may file a motion to seal court records by giving notice to all parties and the victim. GR 15(c)(1). Barnes argues that the trial court failed to enter written findings as required by GR 15 when it sealed TV's recorded forensic interview.

But the record does not support Barnes's claim that the trial court sealed the record under GR 15. The record does not contain a motion by the State to seal the forensic interview from public examination pursuant to GR 15 or a court order granting such motion. Further, neither party referenced GR 15 during the hearing on the protective order. Nowhere in the order does the court prohibit the public from accessing the recording for any purpose. In fact, the order specifically allows for potential dissemination to the media pursuant to court order. Therefore, Barnes's argument fails.

C.    COMPETENCY OF TV TO TESTIFY

Barnes argues that the trial court erred in finding TV competent to testify at trial because the court applied the wrong legal standard for determining competency. He also argues that based on the inconsistencies throughout TV's testimony, she did not demonstrate an ability to receive just impressions and accurately relate events occurring contemporaneously to the incident at issue. We disagree.

### 1. Standard of Review

The determination of a witness's competency is left to the trial court's sound discretion and will not be disturbed on appeal absent a showing of manifest abuse of discretion. *State v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1176 (2005). "There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness." *State v. Borland*, 57 Wn. App. 7, 11, 786 P.2d 810 (1990), *overruled on other grounds*, *State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997). Because the competency of a minor witness is not easily reflected in a written record, we "must rely on the trial judge who sees the witness, notices the witness's manner, and considers his or her capacity and intelligence." *Woods*, 154 Wn.2d at 617. On appeal, we may examine the entire record in reviewing the trial court's competency determination. *Id.*

### 2. No Abuse of Discretion

Barnes argues that the trial court abused its discretion by applying the wrong legal standard to determine that TV was competent to testify. We disagree.

In *State v. Allen*, our Supreme Court outlined the test a trial court must employ when assessing the competency of a child witness. 70 Wn.2d 690, 692, 424 P.2d 1021 (1967). The trial court must determine whether the child exhibits:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Id.* Barnes argues that the trial court applied the wrong legal standard when making a finding on factors one and two.

Regarding the first factor, Barnes argues that the trial court applied the wrong standard because the court relied on TV's answers to the State's hypothetical questions regarding whether something was true or imaginary. The court acknowledged that TV initially struggled in answering the question of whether she understood the difference between the truth and a lie, but found that "she did by examples indicate that she did have an understanding of the difference between fiction and reality." 3 RP at 287. Specifically, TV was able to answer whether a series of posed hypotheticals were truths or lies. She then promised to not testify to anything that was a lie or pretend. The trial court ruled that TV "ha[d] the understanding and the knowledge of her obligation to speak the truth on the witness stand." 3 RP at 287. Therefore, the trial court did not apply the wrong legal standard.

Regarding the second factor, Barnes argues that the trial court applied the wrong standard when it determined that TV had the mental capacity at the time of the occurrence based on her demeanor in the forensic interview. In support, Barnes references the portion of the trial court's ruling describing TV as verbally agile and paying close attention during the forensic exam. However, a trial court may infer the second factor of the *Allen* test based on the child's overall demeanor and manner of answering questions. *State v. Sardinia*, 42 Wn. App. 533, 537, 713 P.2d 122 (1986). Therefore, it was not untenable for the trial court to consider TV's demeanor and ability to answer questions during the interview.

Barnes also argues that the trial court abused its discretion in ruling on factors two and three of the *Allen* test because TV was unable to recall contemporaneous events during her testimony. In support, Barnes points to various inconsistencies in TV testimony over the course of trial.

13

However, "[i]nconsistencies in the child witness's testimony bear on credibility, not admissibility." *State v. Przybylski*, 48 Wn. App. 661, 665, 739 P.2d 1203 (1987). A competency determination of a child witness does not require the trial court examine the child regarding the particular issues and facts of the case. *Id.* at 666 (holding a five year old witness was competent to testify where she "demonstrated an ability to recall and recount past events and to intelligently respond to questions."); *Sardinia*, 42 Wn. App. at 537 (holding the child victim demonstrated an adequate memory to recall the past when she testified that she knew who her school teachers were and what her performance in school had been). Here, TV demonstrated an ability to recall past events and to intelligently respond to questions.

Based on the record, we hold that the trial court did not abuse its discretion in finding TV competent to testify at trial.

D.    ADMISSION OF CHILD HEARSAY STATEMENTS

Barnes argues that the trial court abused its discretion in ruling that TV's child hearsay statements were admissible because (1) there was no corroborative evidence and (2) the trial court failed to consider the reliability of each statement individually. We disagree.

Hearsay statements of a child under the age of 10 are admissible in a criminal case when the statements describe sexual or physical abuse of the child; the court finds that the time, content, and circumstances of the statements provide sufficient indicia of reliability; and either the child testifies at the proceedings or the child's statements are supported with corroborative evidence of the act. RCW 9A.44.120(1), (2)(a), (b); *State v. Kennealy,* 151 Wn. App. 861, 880, 214 P.3d 200 (2009). We review a trial court's decision to admit child hearsay statements for an abuse of discretion. *Id.* at 879.

14

In determining the reliability of child hearsay statements, the trial court considers the *Ryan*[2] reliability factors: (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement. *Id.* at 880. No single factor is decisive, but the factors must be substantially met to indicate sufficient reliability. *Id.* at 881.

Barnes argues that corroborative evidence was required to support TV's hearsay statements because TV should have been ruled incompetent to testify and therefore unavailable. However, as explained above, the trial court did not abuse its discretion in finding TV competent to testify and therefore she was not unavailable as a witness. Because TV testified at trial, the State was not required to support TV's statements with corroborative evidence of the act. RCW 9A.44.120(2)(a), (b).

Regarding Barnes's second argument, Barnes never objected to the trial court's method of applying the *Ryan* factors generally to all of TV's statements rather than on an individual basis. In order to raise the objection for the first time on appeal, the appellant must show admission of the evidence was a "manifest error affecting a constitutional right." *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). But Barnes argues only that the trial court

---

[2] *State v. Ryan*, 103 Wn.2d 165, 176, 691 P.2d 197 (1984).

abused its discretion. He makes no argument on appeal why RAP 2.5(a) applies. Thus, we decline to reach this issue.

We hold that the trial court did not abuse its discretion in ruling that TV's child hearsay statements were admissible under RCW 9A.44.120.

E.     PROSECUTORIAL MISCONDUCT

Barnes argues that the prosecutor's statements during closing argument improperly shifted the State's burden of proof and created a "false choice" by telling the jury that they would need to find the State's witnesses were lying in order to find Barnes not guilty. We disagree.

1.     Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show " 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.' " *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). We review allegedly improper arguments of the prosecutor in the context of the total argument, the evidence addressed during argument, the issues in the case, and the trial court's instructions. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). During closing argument, the State is afforded wide latitude in drawing and expressing reasonable inferences from the evidence. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). The State may also respond to defense arguments in its closing. *Russell*, 125 Wn.2d at 86. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012).

2.     No Misconduct

When the State and defense present two conflicting versions of events at trial, the jury

need not determine which version is true in order to reach a verdict. *State v. Miles*, 139 Wn.

App. 879, 890, 162 P.3d 1169 (2007). Even if the jury remains unpersuaded by the defense

evidence, it still "only [has] to entertain a reasonable doubt as to the State's case." *Id.*

Therefore, a prosecutor engages in misconduct by informing the jury that they may only acquit

the defendant if they believe the evidence defense presented. *Id.*

Barnes relies on *Miles* to argue that the prosecutor here committed misconduct by

commenting on the credibility of the State's witnesses. But here, the prosecutor never told the

jury that they had heard mutually exclusive versions of the events. The prosecutor also never

told the jury that if the defense witnesses are incorrect, then the State's witnesses must be

correct. Given that Barnes did not present any witnesses to testify to a different version of the

events at trial,[3] the prosecutor could not have argued that the jury must choose which side's

witnesses were correct.

Barnes's theory of the case was that Heard had coached TV into disclosing the abuse

because of Heard's animosity toward Keshia. Barnes also directed considerable argument

toward Jones's credibility, who he argued had given a false name to police, had not cooperated

with the investigation, and through her actions showed she did not want to be involved. His

theory was that Jones's hostility during the investigation and trial showed that "she knew Mr.

Barnes was not guilty of these charges." 7 RP at 779. Because Barnes's defense largely entailed

---

[3] At trial, the only witness Barnes called to testify was the defense investigator, who testified to the accuracy of the transcription of the defense interviews of State witnesses.

undermining the credibility of the State's witnesses, it was not improper for the prosecutor to respond to this argument and inform the jurors that they were the sole judges of credibility.

Further, contrary to Barnes's assertion, the State never told the jury that they should find Barnes guilty because he had failed to present any evidence showing he was not guilty. The prosecutor merely argued that there was no evidence to support Barnes's argument that TV and the other witnesses fabricated their testimony. A prosecutor is permitted to argue the absence of evidence to support the defendant's theory of the case.

We hold that the prosecutor's arguments were not improper and therefore that Barnes's prosecutorial misconduct claim fails.

F.      COMMUNITY CUSTODY CONDITIONS

Barnes challenges a number of community custody conditions imposed by the sentencing court as either unauthorized or unconstitutional. We hold the prohibition against frequenting places where children congregate is unconstitutionally vague. We also hold that the conditions restricting Barnes's access of locations where alcohol is sold, use of the Internet, and patronizing businesses promoting commercialization of sex were not crime-related.

1.      Standard of Review

We review de novo the sentencing court's statutory authority to impose a particular community custody condition. *State v. Acevedo*, 159 Wn. App. 221, 231, 248 P.3d 526 (2010). However, we review a challenge that the condition is not crime-related for abuse of discretion. *State v. Sanchez Valencia*, 169 Wn.2d 782, 791-92, 239 P.3d 1059 (2010); *State v. Zimmer*, 146 Wn. App. 405, 413, 190 P.3d 121 (2008).

In applying this standard, we will reverse a condition only if we find that imposition of the condition was manifestly unreasonable. *State v. Irwin*, 191 Wn. App. 644, 652, 364 P.3d 830

(2015). Imposing an unconstitutional condition is "manifestly unreasonable." *Id.* Community custody conditions are not presumed to be constitutionally valid. *Sanchez Valencia*, 169 Wn.2d at 793. If we determine a sentencing court imposed an unauthorized condition on community custody, we remedy the error by remanding to the sentencing court with instruction to strike the unauthorized condition. *State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008).

2.     Frequenting Locations Where Children Congregate

The trial court imposed community custody condition 24, which states, "Do not go to or frequent places where children congregate, (I.E. Fast-food outlets, libraries, theaters, shopping malls, play grounds and parks, etc.) unless otherwise approved by the Court." CP at 173. In *State v. Wallmuller*, this court recently held that a similar condition was unconstitutionally vague. No. 50250-0-II, (Wash. Ct. App. Aug. 7, 2018) (part published), http://www.courts.wa.gov/opinions/pdf/D2%2050250-0-II%20Published%20Opinion.pdf. We follow *Wallmuller* and hold that community custody condition 24 also is unconstitutionally vague.

3.     Other Community Custody Conditions

RCW 9.94A.703(3)(f)[4] provides the sentencing court discretionary authority to order Barnes to "[c]omply with any crime-related prohibitions." A condition is crime-related only if there is specific evidence showing it contributed to the offense. *State v. Jones*, 118 Wn. App. 199, 207-08, 76 P.3d 258 (2003). Barnes argues that the trial court imposed three community custody conditions that were not crime related.

---

4 RCW 9.94A.703 has been amended since the events of this case transpired; however, these amendments do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 9.94A.703.

First, community custody condition 16, states, "Do not enter into any location where alcohol is the primary product, such as taverns, bars, and/or liquor stores." CP at 172. Here, there is no evidence that alcohol played a role in Barnes's offense. Therefore, the trial court erred by prohibiting Barnes from entering a location where alcohol is the primary product.

Second, community custody condition 28 states,

> You shall not have access to the Internet except for educational or employment purposes at any location in any medium to include cellphones, nor shall you have access to, possess, or peruse any sexually explicit materials in any medium. You are also prohibited from joining or perusing any public social websites ([Facebook], Myspace, *Craigslist*, etc.), Skyping, or telephoning any sexually-oriented 900 numbers.

CP at 173. Internet use is crime-related if there is evidence that Internet use "contributed in any way to the crime." *State v. O'Cain*, 144 Wn. App. at 775.

Here, there was no evidence that the Internet use, public social websites, Skype, or sexually-oriented 900 numbers contributed in any way to Barnes's offense. Therefore, the trial court erred by prohibiting Barnes from engaging in those activities.

Third, community custody condition 29 states, "Do not patronize prostitutes or any businesses that promote the commercialization of sex; also, do not go to or loiter at any place where sexually explicit materials are sold." CP at 173. We agree that the sentencing court abused its discretion in imposing the community custody condition prohibiting Barnes from patronizing businesses that promote commercialization of sex. There was no evidence to suggest that businesses promoting the commercialization of sex contributed in any way to Barnes's crime. Therefore, the trial court erred by prohibiting Barnes from patronizing such businesses.

However, we affirm the sentencing court's imposition of the community custody condition prohibiting Barnes from patronizing prostitutes. It is a misdemeanor to patronize a prostitute. RCW 9A.88.110(1)(c)(3). And the sentencing court may require an offender to

engage in law-abiding behavior. *Jones*, 118 Wn. App. at 205-06. Therefore, the sentencing court did not abuse its discretion in prohibiting Barnes from patronizing prostitutes in violation of Washington law.

We hold that the sentencing court abused its discretion in imposing community custody conditions 16, 24, 28, and the portion of 29 related to patronizing businesses that promote the commercialization of sex and frequenting places where sexually explicit material is sold.

CONCLUSION

We affirm Barnes's conviction, but we remand with instructions to strike community custody conditions 16, 24, 28 and a portion of condition 29.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, C.J.

I concur:

WORSWICK, J.

Lee, J. (concur in part and dissent in part) — I concur with the majority's opinion in all respects, except with regard to Barnes' challenge to community custody condition 24 on unconstitutional vagueness grounds.

Barnes challenges community custody condition 24, which prohibits him from frequenting places where children congregate unless otherwise approved by the court. He argues that the condition was not crime-related and was unconstitutionally vague. For the same reasons articulated in my concurrence/dissent in *State v. Wallmuller*, No. 50250-0-II, (Wash. Ct. App. Aug. 7, 2018) (part published), http://www.courts.wa.gov/opinions/pdf/D2%2050250-0-II%20Published%20Opinion.pdf, I respectfully disagree with the majority and would hold that the condition was crime-related and not unconstitutionally vague.

_____
LEE, J.