162 P.3d 1169 (2007)
STATE of Washington, Respondent,
v.
Nathaniel Wesley MILES, Appellant.
No. 35207-9-II.
Court of Appeals of Washington, Division 2.
July 24, 2007.
*1170 Rita Joan Griffith, Seattle, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty Office, Tacoma, WA, for Respondent.
ARMSTRONG, J.
¶ 1 Nathaniel W. Miles appeals his conviction of delivery of a controlled substance, arguing that the prosecutor committed flagrant misconduct by questioning defense witnesses about Miles's participation in specific boxing matches, during the time Miles claimed to be incapacitated, without producing extrinsic evidence of those fights. He also argues that the prosecutor improperly shifted the burden of proof to Miles by asserting that the jury had to find that the State's witnesses were lying in order to acquit Miles. Because the prosecutor's questioning of the defense witnesses amounted to an attempt to impart evidence that he was either unwilling or unable to prove through extrinsic evidence, we reverse.

FACTS
¶ 2 The State charged Nathaniel Miles with one count of unlawful delivery of a controlled substance and alleged that he committed the crime within 1,000 feet of a school bus stop.
*1171 ¶ 3 The charge arose from a controlled buy that Ronald Wilmoth, a confidential informant working for the Tacoma Police Department, conducted in May 2004. Wilmoth told police that an acquaintance, Miles, had offered to sell him crack cocaine. Officers instructed Wilmoth to arrange a meeting and provided him with $250 to $300 to make the purchase.
¶ 4 Wilmoth testified that Miles arrived at the meeting in his car. Wilmoth got into the car and purchased cocaine from Miles with the buy money. Miles was alone in the car and appeared to be in good health.
¶ 5 Although officers recorded and filmed the transaction and maintained visual surveillance, no officer saw the driver of the car or how many people were inside it. The officers did not stop the car because they intended to initiate another controlled buy from its driver.
¶ 6 Miles denied that he was the driver of the car or that he sold narcotics to Wilmoth. He testified that after he was shot in 2001 or 2002, he was incapacitated and required daily care from Kawana Bell. He was still receiving daily care from Bell at the time of the controlled buy. He testified that the shooting left him unable to drive a car and he had not driven since the shooting. Bell testified that she cared for Miles from 2001 to 2005 and during this time he was unable to drive an automobile.
¶ 7 Miles and Bell both testified that Miles was a professional boxer before he was shot. Miles testified that his last fight was in 2000 before he was shot. The prosecutor cross-examined Bell about Miles's boxing as follows:
Q. Okay. So based on his physical condition during that time from 2001 to 2005, he was in no condition to box, for instance?
A. No.
Q. Okay. So there's no way on August 13th, 2004, that he could have fought Neil Stevens at the Angelston Convention Center in Ogdon [sic], Utah?
A. Neil Stevens.
Q. There's no way he could have gone by a 12-round decision where it went to the judge's scorecard after 12 rounds? What I'm asking is Mr. Miles, in the condition that you observed him in, he couldn't have gone 12 rounds in a boxing fight in 2004, right?
A. No.
Q. No?
A. (Witness mumbling).
Q. There's no way that he could have fought Peter O'Cain February 4th of 2005 in Winnipeg? He would have been in no physical condition, right?
A. Not to my knowledge. I don't know.
Q. Okay. Especially  that one went 12 rounds as well?
A. 12, I don't know.
Report of Proceedings (RP) at 105-06.
¶ 8 The prosecutor cross-examined Miles about his boxing as follows:
Q. And the last fight you fought was in 2000 at the Emerald Queen Casino. Who did you fight?
A. I think it was Ronnie Warren.
Q. Yeah? Tell me if this sounds about right. You weighed in at 175 for that fight?
A. Huh-uh. No way. I weighed about 187, something like that.
Q. What division were you fighting in?
A. Cruiser weight.
Q. Cruiser weight. You say your date of birth is June 12th of '65?
A. Correct.
Q. Tell me if this profile describes you accurately: Sex, male; that's obvious. Nationality, you're a United States American, U.S. American?
A. Yes, sir.
Q. Nickname "Tex." We talked a little bit about that. Hometown, Tacoma, Washington; or would it be Houston, Texas?
A. Houston, Texas.
Q. Okay. Division, cruiser weight?
A. That I fought. . . .
Q. Date of birth June 12th of '65?
A. Correct.
Q. Okay. But if I were to find nine fights after you fought Ronnie Warren at the *1172 Emerald Queen Casino, those are all mistaken?
A. Nine at the Emerald Queen?
Q. No, nine fights after you fought Ronnie Warren at the Emerald Queen. Were they all mistakes?
A. They have to be except probably one fight off Ronnie, I think.
Q. Well, you indicated that Ronnie was your last fight.
A. That's at the Emerald Queen, he was.
Q. So you fought since 2000?
A. That's why I say 2000, 2001 when you asked me. 2000 or 2001.
Q. Okay. Who did you fight next?
A. Oh, I can't remember the guy's name.
Q. Alex Bonima?
A. No. I don't remember fighting no Alex Bonima.
Q. Where did you fight?
A. If I can remember, he's  this guy here is in the middle  he's a real light guy; he wouldn't be able to fight me.
Q. Who is the guy you fought after Ronnie Warren . . . if you can remember?
A. If I can remember, I think it was in North Dakota.
Q. Okay. But you don't remember who?
A. No, sir. I can't remember his name.
Q. Fred Moore?
A. No, I can't remember.
RP at 116-19.
¶ 9 The only rebuttal evidence the State presented was the testimony of Detective John Ringer, who testified that he had seen Miles about 10 times from 2001 to 2005, "either in traffic or out and about," and that Miles appeared to be in good condition both physically and mentally. RP at 124-25.
¶ 10 The jury convicted Miles of delivery of a controlled substance and found that he committed the crime within 1,000 feet of a school bus stop. Miles now appeals.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT
¶ 11 Miles argues that the prosecutor committed misconduct in cross-examining him and Bell about specific acts without providing factual support that those acts actually occurred and in telling the jurors that they had to find that the State's witnesses were lying in order to acquit Miles.
¶ 12 A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Hughes, 118 Wash.App. 713, 727, 77 P.3d 681 (2003) (citing State v. Stenson, 132 Wash.2d 668, 718, 940 P.2d 1239 (1997)). Prejudice exists if there is a substantial likelihood that the misconduct affected the verdict. State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006). Where, as here, a defendant does not object or request a curative instruction, he waives the error unless we find the remark "`so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" McKenzie, 157 Wash.2d at 52, 134 P.3d 221 (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997)).

II. QUESTIONS ABOUT FIGHTS
¶ 13 Miles asserts that the prosecutor's questions on cross-examination implied that he knew about Miles's specific fights but never offered evidence of the fights, thus denying Miles the right to a fair trial and the right to confront the witnesses against him. The State insists that, because Miles and Bell raised the issue of Miles's physical condition at the time of the crime, the prosecutor was free to inquire if Miles had boxed since the shooting.
¶ 14 "A person being tried on a criminal charge can be convicted only by evidence, not by innuendo." State v. Yoakum, 37 Wash.2d 137, 144, 222 P.2d 181 (1950). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution grant criminal defendants the right to confront and cross-examine adverse witnesses. State v. Hudlow, 99 Wash.2d 1, 14-15, 659 P.2d 514 (1983). A prosecutor's impeachment of a witness by referring to extrinsic evidence *1173 that is never introduced may violate a defendant's right to confrontation. State v. Babich, 68 Wash.App. 438, 445-46, 842 P.2d 1053 (1993). A prosecutor may not use impeachment as a means of submitting evidence to the jury that is otherwise unavailable. Babich, 68 Wash.App. at 444, 842 P.2d 1053 (citing United States v. Silverstein, 737 F.2d 864, 868 (10th Cir.1984)). And a prosecutor who asks questions that imply the existence of a prejudicial fact must be prepared to prove that fact. Babich, 68 Wash.App. at 444, 842 P.2d 1053 (citing Silverstein, 737 F.2d at 868).
¶ 15 In Yoakum, the prosecutor quoted from a transcript of a taped interview that police conducted with the defendant but did not produce any extrinsic evidence of the interview. Yoakum, 37 Wash.2d at 139-41, 222 P.2d 181. The court noted that the questions could have been the foundation for impeachment, but the State did not follow up with rebuttal testimony. Yoakum, 37 Wash.2d at 143, 222 P.2d 181. The court reversed, holding that the effect of the prosecutor's questioning was to place before the jury, as evidence, the substance of the taped conversation without the sworn testimony of any witness. Yoakum, 37 Wash.2d at 144, 222 P.2d 181.
¶ 16 Similarly, in Babich, the prosecutor appeared to use a transcript of a conversation allegedly recorded with a hidden body wire to impeach defense witnesses, but did not introduce extrinsic evidence of the conversation. Babich, 68 Wash.App. at 441-42, 842 P.2d 1053. The witnesses either denied making the statements or stated they could not remember making them. Babich, 68 Wash.App. at 441-42, 842 P.2d 1053. The court held that, without introduction of extrinsic evidence of the taped conversation, the prosecutor's questioning was improper. Babich, 68 Wash.App. at 444-46, 842 P.2d 1053. And in State v. Beard, the prosecutor questioned the defendant about several prior convictions, which the defendant denied. State v. Beard, 74 Wash.2d 335, 338, 444 P.2d 651 (1968). Again, because the State offered no evidence to prove the convictions, the court held that the questioning was improper. Beard, 74 Wash.2d at 339, 444 P.2d 651.
¶ 17 Here, the prosecutor did more than merely inquire if Miles had boxed since his injury. His questions implied that Miles had boxed in specific matches, on specific days, at specific locations, with specific results. He questioned Bell as if he had details of two specific fights Miles had participated in. And he questioned Miles as if he was reading from a profile of a boxer, asking Miles if the profile fit him, and as if he had the records of nine fights that Miles participated in after 2001.
¶ 18 Where a prosecutor's questions refer to extrinsic evidence that is never introduced, "[d]eciding if the questions are inappropriate requires examining whether the focus of the questioning is to impart evidence within the prosecutor's personal knowledge without the prosecutor formally testifying." State v. Lopez, 95 Wash.App. 842, 855, 980 P.2d 224 (1999) (citing 5A KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE, § 258 at 125 (3d ed. supp.1998-99)). There is no conceivable purpose for asking these questions without rebuttal witnesses available other than to impart to the jury the prosecutor's knowledge of fights Miles allegedly participated in without presenting direct evidence of them. As in Babich, "[i]t was not the questions themselves that were improper; it was the failure to prove the statements in rebuttal that was error." Babich, 68 Wash.App. at 446, 842 P.2d 1053. Without extrinsic evidence of these alleged fights, this questioning was improper.
¶ 19 The State attempts to distinguish Yoakum, Babich, Beard, and the other cases that Miles cites because they involve impeachment with prior inconsistent statements or prior convictions. But this distinction is immaterial. A lawyer may not assume facts not in evidence, "not because the facts are inadmissible, but because no witness is willing and available to testify as to those facts." 5 KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE LAW AND PRACTICE, § 103.22 (4th ed.1999). Here, as in the cases described above, the prosecutor attempted to get evidence before the jury that he was either unable or unwilling to prove.
*1174 ¶ 20 The State asserts that whether or, not Miles boxed after his shooting injury had only a remote and indirect connection to the central issue at trial and presenting evidence of it would have caused undue delay. We disagree. Miles and Bell testified that Miles was seriously disabled and unable to drive at the time of the alleged drug sale. The prosecutor's questions directly challenged Miles's incapacity claim, going to the heart of Miles's defense by strongly suggesting to the jury that Miles had participated in a number of fights during the time he claimed to be incapacitated.[1]
¶ 21 The State relies on United States v. Martel, 792 F.2d 630, 636 (7th Cir.1986), for the proposition that a court "will not ordinarily impute bad faith to a party's failure to volunteer its factual basis." Br. of Respondent at 8. In Martel, the prosecutor asked a defense witness one question about a prior statement, which the witness denied, without introducing extrinsic evidence of the statement. Martel, 792 F.2d at 636. Here, on the other hand, the prosecutor cross-examined the two defense witnesses at length and in detail about specific fights, which, if the jury believed the prosecutor's representations, completely undermined the defense theory. While these questions would have been entirely proper had they been the foundation for rebuttal evidence of boxing matches, without this evidence they were a flagrant attempt to place evidence before the jury that appeared to have been otherwise unavailable.
¶ 22 Moreover, we do not fault Miles's counsel for failing to object to the questions when the prosecutor asked them. Until the State rested its rebuttal, Miles had no way of knowing whether the State would prove that Miles had engaged in the fights. And by that time, it was too late to undo the prejudice resulting from the prosecutor's reference to the fights in questions that the jury heard. See Babich, 68 Wash.App. at 446, 842 P.2d 1053.
¶ 23 Nor can we say that the prosecutor's misconduct did not likely affect the verdict. The only evidence connecting Miles to the crime was the testimony of Wilmoth, the confidential informant. No officers identified Miles as the driver of the car where the buy took place. And the State presented no evidence that he was the owner of or otherwise connected to the car or that police ever found the marked buy money in his possession. Even considering Detective Ringer's testimony that he had seen Miles "out and about" during the time Miles claimed he was incapacitated, we cannot say that a jury would have reached the same result if the prosecutor had not improperly attempted to introduce evidence of the fights. Accordingly, we reverse Miles's conviction.

III. CLOSING ARGUMENT
¶ 24 Miles also asserts that the prosecutor committed misconduct in his closing argument by telling the jury that in order to convict the defendant it had to find that the State's witnesses were lying.
¶ 25 In closing, the prosecutor told the jury that they had heard "mutually exclusive" versions of events  the State's version and Miles's version. RP at 152. He continued: "What do I mean by that? To simplify it as much as possible, if one is true, the other cannot be, as I'm sure you all know. If the State's witnesses are correct, the defense witnesses could not be and vice versa." RP at 152.
[I]n this case you have no choice because you have two conflicting versions of events. One is not being candid with you. . . . You are being asked to use your experience and your common sense to decide which version of events that you have heard over in this courtroom over the course of this trial is more credible.
RP at 154-55. The prosecutor then reviewed the testimony of each witness and argued about the credibility of each.
¶ 26 Although prosecutors have "wide latitude" to make inferences about witness credibility, it is flagrant misconduct to shift the burden of proof to the defendant. *1175 State v. Stenson, 132 Wash.2d 668, 727, 940 P.2d 1239 (1997) (citing State v. Hoffman, 116 Wash.2d 51, 94-95, 804 P.2d 577 (1991)); State v. Fleming, 83 Wash.App. 209, 213-14, 921 P.2d 1076 (1996). Miles is correct that the jury did not have to believe Miles to acquit him; they had only to entertain a reasonable doubt as to the State's case. When the State's evidence contradicts a defendant's testimony, a prosecutor may infer that the defendant is lying or unreliable. State v. McKenzie, 157 Wash.2d 44, 59, 134 P.3d 221 (2006) (citing State v. Copeland, 130 Wash.2d 244, 291-92, 922 P.2d 1304 (1996)). Nonetheless, to the extent the prosecutor's argument presented the jurors with a false choice, that they could find Miles not guilty only if they believed his evidence, it was misconduct. The jury was entitled to conclude that it did not necessarily believe Miles and Bell, but it was also not satisfied beyond a reasonable doubt that Miles was the person who sold the drugs to Wilmoth.
¶ 27 Reversed and remanded.
We concur: VAN DEREN, A.C.J., and PENOYAR, J.
NOTES
[1] The effect of the prosecutor's questions on the jury's consciousness is evident in a question the jury submitted to the court requesting, "Dates of boxing match in 2002 to 2004." Clerk's Papers (CP) at 26.