IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36999-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSHUA J. MOBLEY, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Joshua Mobley appeals his judgment and sentence for second degree murder. We affirm.

BACKGROUND

Beginning in February 2017, Joshua Mobley and his wife, Jenifer Mobley, provided childcare for C.H.,[1] a 10-month-old boy. C.H.'s mother is Crystal Henry. On February 26, 2017, Mr. Mobley watched C.H. After 9:00 p.m., the Mobleys picked Ms.

---

[1] To protect the privacy interests of the child victim, we use his initials throughout this opinion. Gen. Order 2012-1 of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber =2012_001&div=III.

Henry up from a medical appointment and returned Ms. Henry and C.H. to Ms. Henry's

apartment. Mr. Mobley carried C.H. inside and, without turning on the lights, placed him

on one of Ms. Henry's couches. Mr. Mobley insisted Ms. Henry should leave C.H. alone

due to his heavy sleeping. Choosing to not bother C.H., Ms. Henry went to sleep nearby

on another couch.

Early the next morning, Ms. Henry awoke to feed C.H., but found he was cold.

C.H. had bruising on his face, abrasions on his nose, and markings on his back. Ms.

Henry called 911. Law enforcement arrived and applied infant cardiopulmonary

resuscitation. Fire department personnel determined C.H. was dead. An autopsy examiner

concluded C.H. died of bilateral subdural hemorrhage due to blunt impact to his head.

Law enforcement arrested Mr. Mobley and searched his residence finding, among

other things, bloodstains containing C.H.'s DNA.[2] The State of Washington charged Mr.

Mobley with second degree felony murder, predicated on his second degree assault of

C.H. The jury rendered a guilty verdict, along with finding three aggravating

circumstances. The trial court issued an exceptional sentence of 336 months'

confinement.

Mr. Mobley timely appeals.

---

[2] Deoxyribonucleic acid.

2

ANALYSIS

Mr. Mobley raises several arguments on appeal: (1) the warrant to search his home was overbroad, (2) the trial court erroneously excluded other suspect evidence, (3) witness C.M. was incompetent to testify, (4) improper admission of Ms. Henry's 911 call, (5) prosecutorial misconduct in summation, (6) cumulative error, and (7) improper exceptional sentence.

*Search warrant*

The warrant to search Mr. Mobley's residence authorized officers to "diligently search for and seize . . . DNA evidence to include any body fluids, hair, blood, saliva, vomitus, and/or other bodily fluids." Clerk's Papers at 969. Mr. Mobley asserts this language was overbroad because it did not limit the police's search for DNA evidence to evidence regarding C.H. The State responds that, given the nature of DNA, the warrant was as narrow as practicable. We agree with the State.

To be valid under the Fourth Amendment to the United States Constitution, a warrant must be based on probable cause and particularly describe "the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. This latter prerequisite is known as the particularity requirement. It was adopted to protect against "indiscriminate exploratory rummaging of personal property" by government agents.

3

*State v. Fairley*, 12 Wn. App. 2d 315, 320, 457 P.3d 1150, *review denied*, 195 Wn.2d 1027, 466 P.3d 777 (2020). In general, the particularity requirement demands a warrant describe items to be seized with "as much specificity as possible" in order to prevent over seizure. *Id*. at 322.

The warrant here was sufficiently specific. Due to the inherent size and nature of DNA evidence, it is impossible for law enforcement to identify and describe relevant DNA evidence prior to the search. *See State v. Clark*, 143 Wn.2d 731, 754, 24 P.3d 1006 (2001). The warrant here stated the crime under investigation was second degree murder and the deceased was a 10-month-old child. No other meaningful limitations on the search for DNA were practicable. The trial court correctly denied Mr. Mobley's suppression motion.

*Other suspect evidence*

Mr. Mobley argues the trial court violated his constitutional right to present a defense by excluding evidence about an alternative suspect, Jeanynes Bell. Mr. Mobley proffered evidence that Ms. Bell had previously sent threatening messages to Ms. Henry. At least one of Ms. Bell's messages referenced Ms. Henry's baby. Mr. Mobley also proffered that Ms. Bell was in Spokane (the same city as Ms. Henry) at the time of C.H.'s death and may have been able to discover her home address.

4

In general, other suspect evidence should be admitted if relevant and not overly prejudicial. *State v. Franklin*, 180 Wn.2d 371, 378-79, 325 P.3d 159 (2014). Relevance is established if proffered evidence tends to connect someone other than the defendant with the crime. *Id*. at 381. Ultimately, the test for admissibility is similar to that set out by ER 403. *Id*. at 380. A trial court's decision to exclude other suspect evidence is reviewed for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004).

The trial court here did not abuse its discretion in excluding Mr. Mobley's other suspect evidence. While Mr. Mobley showed Ms. Bell had a motive to harm Ms. Henry and perhaps C.H., there was no evidence indicating when or how Ms. Bell might have had access to C.H in order to cause his death. Mr. Mobley suggests that Ms. Henry may have left the door to her apartment unlocked on the night of C.H.'s death and that Ms. Bell may have entered the residence and killed C.H. while he slept on the couch near his mother. This proffer is nothing but speculation. There was no affirmative evidence of an unlocked door or any other unauthorized entry. Further, Mr. Mobley's suggestion that Ms. Bell snuck into Ms. Henrys apartment and killed C.H. by the use of blunt force while not harming or awaking Ms. Henry defies common sense. We affirm the trial court's other suspect decision.

*Witness competence*

The State identified Mr. Mobley's daughter, C.M. as a trial witness. C.M. was five

years old at the time of C.H.'s death. Eleven months later, she participated in forensic

interviews with a social worker. C.M. disclosed seeing Mr. Mobley step on C.H. She also

remembered Mr. Mobley placed C.H. in the garage because he was crying.

Mr. Mobley challenged C.M.'s testimonial competence, claiming she lacked

the ability to independently recall his interactions with C.H. In support of this claim,

Mr. Mobley submitted testimony from C.M.'s mother and grandmother, describing

C.M.'s vivid imagination and explaining C.M. had been exposed to post-event

information regarding C.H.'s death. Mr. Mobley also presented testimony from a

cognitive psychologist who explained the high risk of false memories associated with

young children, especially those aged three to eight. Although the psychologist had not

interviewed C.M., he was concerned by the fact that C.M. had been present when law

enforcement interviewed C.M.'s mother, thereby presenting a risk she integrated post-

event information into her memory. The psychologist did not detect any problems with

C.M.'s forensic interviews; his only criticism was the 11-month delay.

The trial court overruled Mr. Mobley's objection to C.M.'s testimony. Along with

Mr. Mobley's evidence, the court considered testimony from C.M., video footage of C.M.

at the time law enforcement interviewed C.M.'s mother, and video exhibits of C.M.'s two

forensic interviews. The court found C.M. demonstrated a memory of Mr. Mobley's

interactions with C.H., including times when Mr. Mobley placed C.H. in the garage and

stepped on C.H. The court reasoned that the concerns raised by the defense regarding

C.M.'s reliability went to weight, not admissibility.

All witnesses, including children, are presumed competent to testify. ER 601;

*see* RCW 5.60.050. A party challenging a witness's competence bears the burden of

proof. *State v. S.J.W.*, 170 Wn.2d 92, 102, 239 P.3d 568 (2010). We review a trial court's

competency determination for abuse of discretion. *State v. Brousseau*, 172 Wn.2d 331,

340, 259 P.3d 209 (2011). This is a very deferential standard. We must affirm a trial

court's decision under the abuse of discretion standard unless it lacked a tenable basis in

law or fact. *Coggle v. Snow*, 56 Wn. App. 499, 507, 784 P.2d 554 (1990).

The trial court here had a tenable basis for denying Mr. Mobley's challenge to

C.M.'s competence. The court issued a written decision, detailing the factors relevant to

competence under *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).[3] The only

---

[3] The *Allen* factors are: (1) an understanding of the duty to speak the truth,
(2) mental capacity at the time of the occurrence to retain an independent recollection,
(3) sufficient memory to retain an independent recollection of the occurrence, (4) ability
to express memory in words, and (5) ability to understand simple questions about the
occurrence. 70 Wn.2d at 692.

contested factor was whether C.M. had "a memory sufficient to retain an independent recollection of the occurrence." *Id*. The trial court observed C.M. both in person and on video. C.M. was able to describe past events, including ones contemporaneous to the allegations against Mr. Mobley. While the credibility of some of C.M.'s statements may have been impeachable due to exposure to post-event information, this was nothing more than a possibility. Although C.M.'s mother and grandmother surmised C.M. had been exposed to post-event information regarding C.H.'s death, no one ever asked C.M. about this issue. In fact, C.M. stated she did not remember police interviewing her mother. We affirm the trial court's determination that Mr. Mobley did not meet his burden of establishing C.M.'s lack of competence to testify.

*911 Call*

Joshua Mobley contends the trial court abused its discretion[4] in admitting, over his objection, Ms. Henry's emotional 911 call. According to Mr. Mobley, evidence of the call was more prejudicial than probative and should have been excluded under ER 403.

We disagree with Mr. Mobley's assessment. One of Mr. Mobley's arguments was that Ms. Henry was responsible for C.H.'s death. The 911 call was highly relevant to

---

[4] A trial court's evidentiary rulings are reviewed for abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 750, 202 P.3d 937 (2009).

assessing Ms. Henry's reaction to C.H.'s death and discerning whether she might have injured her son. The trial court had an adequate basis for admitting the evidence over Mr. Mobley's ER 403 objection.

*Prosecutorial misconduct*

Mr. Mobley claims the State committed two types of misconduct during closing argument: (1) improperly shifting the burden of proof and (2) commenting on Mr. Mobley's assertion of the right to silence. Neither issue generated an objection. Thus, the success of Mr. Mobley's arguments on appeal turn on whether the "prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

*Burden of proof*

Mr. Mobley points to two isolated instances in summation where he claims the prosecutor shifted the burden of proof. First, the prosecutor argued that, based on the circumstantial evidence, "what would be the chances" of more than one person injuring

C.H.[5] Second, the prosecutor's rebuttal argument referenced C.M.'s testimony that

somebody must be lying because she did not believe her father killed C.H.[6] The

prosecutor stated, "As [C.M.] stated when she was on the stand, somebody is lying.

It will be your job, as jurors, to decide who is telling the truth and who is not." 9 Report

of Proceedings (RP) (June 25, 2019) at 2244.[7]

It is questionable whether the prosecutor's brief statements constituted misconduct.

The prosecutor is allowed to argue guilt based on a probabilistic assessment of

circumstantial evidence. *State v. Killingsworth*, 166 Wn. App. 283, 291-92, 269 P.3d

1064 (2012). Doing so does not suggest the defense has the obligation to rebut the State's

evidence. *Id.* at 291. In addition, while the prosecutor cannot tell the jury it must find

---

[5] The prosecutor stated, "Now, yes, we have prior injuries. Could the injuries that were inflicted at this time or on these times have been done by a different person than the person who ultimately—who inflicted the fatal blows? Theoretically. But how likely is that? Is this more of a pattern of hurting [C.H.] or were there—what would be the two chances, what would be the chances of two people in the universe assaulting [C.H.] within a week or so in the same manner? Incontestable." 9 Report of Proceedings (RP) (June 25, 2019) at 2183-84.

[6] At the close of her testimony, C.M. stated, "[W]e know that somebody's lying because we know that he didn't—my papa didn't kill baby [C.H.]." 8 RP (June 20, 2019) at 1827.

[7] Mr. Mobley also complains the prosecutor stated, "somebody savagely beat a ten-month-old child to death." 9 RP (June 25, 2019) at 2242. However, he fails to identify the problem with this statement. It was essentially uncontested at trial that C.H. died as a result of nonaccidental blunt force trauma.

someone was lying in order to acquit, counsel can properly remind the jury of its role in

making credibility determinations. *State v. Wright*, 76 Wn. App. 811, 823-26, 888 P.2d

1214 (1995). "[T]here is nothing misleading or unfair in stating the obvious: that if the

jury accepts one version of the facts, it must necessarily reject the other." *Id*. at 825.

Even if the State's arguments were improper, Mr. Mobley would still need to show

they were sufficiently offensive to meet the standard for reversal based on unpreserved

prosecutorial misconduct. The Supreme Court's decision in *Emery* is helpful on this

point. *Emery* found that a prosecutor at trial had committed two types of misconduct

during summation: (1) a fill-in-the blank argument that improperly shifted the burden of

proof,[8] and (2) a claim that the jury's job was to speak the truth or declare the truth.[9]

174 Wn.2d at 759-60. Despite finding misconduct, the court held reversal unwarranted

because there had been no objection. *Emery* noted misstatements of law, such as

arguments that improperly shift the burden of proof, are not inherently inflammatory.

---

[8] A fill-in-the-blank argument is one that tells the jury that in order to acquit based on reasonable doubt it must "fill in [the] blank" with a specific reason for its decision. *Emery*, 174 Wn.2d at 750-51. This argument fails to recognize that a jury "need do nothing to find a defendant not guilty" and the defendant "bears no burden." *Id*. at 759-60.

[9] The prosecutor's "truth" arguments in *Emery* were improper because they mischaracterized the jury's role. 174 Wn.2d at 760. "The jury's job is not to determine the truth of what happened . . . . Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *Id*.

11

*Id*. at 763. As such, they can be properly cured if brought to the trial court's attention. *Id*. at 764-65. So long as there was a possibility of cure at the trial court level, reversal on appeal is unwarranted.

Mr. Mobley does not argue the "what are the chances" and "somebody is lying" arguments were inherently inflammatory. An inflammatory argument is one that appeals to a jury's passions and prejudices, such as statements that tend to dehumanize the defendant or to inject racial bias into the proceedings. *See Emery*, 174 Wn.2d at 763 (citing *State v. Belgarde*, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) (using racially inflammatory arguments); *State v. Reed*, 102 Wn.2d 140, 144-46, 684 P.2d 699 (1984) (calling defendant a liar, classifying him as "'murder two,'" playing on socioeconomic class prejudice, and stating defense "did not have a case")); *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170-71, 410 P.3d 1142 (2018) (citing *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011) (racially inflammatory arguments)). A prosecutor's use of inflammatory arguments may warrant reversal despite the lack of objection at trial. The reasoning in support of reversal under these circumstances is that once a jury is exposed to inflammatory remarks there is, in essence, a de facto mistrial. *See Emery*, 174 Wn.2d at 762 (quoting *State v. Case*, 49 Wn.2d 66, 74, 298 P.2d 500 (1956)). Nothing can be done to remedy the fairness of the proceedings. *See id.* While not all inflammatory

remarks will require a mistrial, they are likely incurable when repeated or utilized as an overarching theme. *State v. Loughbom*, 196 Wn.2d 64, 75, 470 P.3d 499 (2020).

Instead of being inflammatory, Mr. Mobley's complaints are legalistic. They are precisely the type of criticisms *Emery* held should be raised at trial and addressed through instructions. Reversal is not appropriate when raised for the first time on appeal.

*Commenting on silence*

Mr. Mobley claims the prosecutor improperly commented on his constitutional right to silence in making the following statement:

> Now, the other clue is from Mr. Mobley himself when contacted by law enforcement. First, he says—remember, they introduced themselves, hi, we're with the police department. Oh, can we do this later, I'm too busy. What, if anything, strikes you about the first words that come out of this man's mouth? They hadn't even told him why they were there yet, and he's already saying he's too busy.

9 RP (June 25, 2019) at 2197.

Understanding Mr. Mobley's criticism of the State's argument requires an explanation of the underlying facts. Three plain clothes detectives went to Mr. Mobley's home on the morning of C.H.'s death. After Mr. Mobley answered the door, the detectives identified themselves and asked if they could speak to Mr. Mobley and his wife. Mr. Mobley said he was busy getting ready for the day and asked if he could speak with the detectives later. The detectives advised it was important and pertained to C.H.

13

Mr. Mobley's wife then invited the detectives inside. At that point, the detectives told

Mr. Mobley and his wife C.H. had died. Upon receiving this information, Mr. Mobley's

facial coloring changed. Then he said he should probably speak with an attorney.

Mr. Mobley was subsequently placed under arrest.

The parties addressed the foregoing interactions at a CrR 3.5 hearing. The trial

court determined Mr. Mobley was not in custody at the time the detectives came to his

door. Thus, they were entitled to testify to his initial statements and demeanor. The court

made clear the State was not to elicit testimony regarding Mr. Mobley's request to speak

to an attorney. While the court allowed the State's witnesses to testify about Mr. Mobley's

visible demeanor, they were prohibited from testifying about his likely mental state.[10]

Mr. Mobley does not challenge the trial court's CrR 3.5 ruling.

The prosecutor's argument complied with the terms of the CrR 3.5 ruling. The

prosecutor did not mention Mr. Mobley's assertion of the right to counsel. Nor did the

prosecutor make a general comment on Mr. Mobley's exercise of his right to silence.

Mr. Mobley's statement that he was busy and wanted to talk later cannot fairly be

construed as an invocation of constitutional protections; to the contrary, he expressed

---

[10] While the trial court prohibited the detectives from speculating about Mr. Mobley's mental state, there was no prohibition on the prosecutor arguing Mr. Mobley's mental state based on fair inferences from the record.

an interest in talking, just at a later time. Furthermore, because Mr. Mobley had not yet

been placed under arrest, there was no constitutional prohibition on the prosecutor

making comments that could have been construed as reflecting on Mr. Mobley's silence.

*See Salinas v. Texas*, 570 U.S. 178, 184-86, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013)

(plurality opinion); *State v. Magana*, 197 Wn. App. 189, 195, 389 P.3d 654 (2016)

("[A]bsent an express invocation of the right to silence, the Fifth Amendment [to the

United States Constitution] is not an obstacle to the State's introduction of a suspect's

prearrest silence as evidence of guilt."). There was no misconduct.

*Cumulative error*

Mr. Mobley argues that even if the errors in his case do not warrant relief when

reviewed in isolation, his conviction should be reversed based on cumulative error.

Because we do not find multiple errors,[11] we reject this argument.

*Exceptional sentence upward*

Along with its guilty verdict, Mr. Mobley's jury entered a special verdict form,

finding three aggravating circumstances: (1) that the victim was particularly vulnerable,

(2) that the defendant used his position of trust or confidence to facilitate the offense, and

---

[11] At most, the prosecutor made two misstatements in summation regarding burdens of proof. However, as *Emery* teaches, such errors do not warrant reversal when raised for the first time on appeal even if they are multiple.

15

(3) the crime had a destructive and foreseeable impact on persons other than the victim.

The aggravating circumstances authorized the trial court to impose an exceptional

sentence upward. Consistent with this authority, the court imposed a sentence of 336

months, 116 months above the high end of the standard range.

For the first time on appeal, Mr. Mobley argues the trial judge's decision to impose

an exceptional sentence improperly rested on facts beyond those authorized by the jury's

verdict. He makes this argument based on the following comment at sentencing:

> [THE COURT:] So with all of that in mind, and attempting to use the best discretion that I have, having the facts at trial that I am cognizant of, *I have additional facts because I sat through the pretrial motions, so there is other things that the Court is aware of that isn't necessarily something that the jury was aware of, but this jury made the decision that it did*. And while I understand that the appeal is going to occur, that is not something I take into consideration when I impose sentence at this stage.

10 RP (Aug. 9, 2019) at 2307 (emphasis added).

We decline to entertain Mr. Mobley's arguments as they were not preserved and

any claim of error is not manifest. RAP 2.5(a) ("The appellate court may refuse to review

any claim of error which was not raised in the trial court. However, a party may raise the

following claimed errors for the first time in the appellate court: . . . (3) manifest error

affecting a constitutional right."). Manifest error is an "'error that is plain and

indisputable, and that amounts to a complete disregard of the controlling law or the

16

credible evidence in the record.'" *State v. O'Hara*, 167 Wn.2d 91, 100 n.1, 217 P.3d 756 (2009) (quoting BLACK'S LAW DICTIONARY 622 (9th ed. 2009)). Here, the trial judge never plainly stated she was basing her sentencing decision on facts that were not presented to the jury; she merely acknowledged the unremarkable fact that she had been privy to facts beyond those presented at trial. If Mr. Mobley thought the judge's comments indicated a misunderstanding of the constitutional restrictions on an exceptional sentence upward, he should have objected. We will not presume a misunderstanding and take corrective action when the issue is raised for the first time on appeal.

## CONCLUSION

The judgment of conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, C.J.
Pennell, C.J.

I CONCUR:

_____
Lawrence-Berrey, J.

17

No. 36999-4-III

FEARING, J. (concurring) — I reluctantly concur. I conclude that the State violated Joshua Mobley's right to remain silent, but United States Supreme Court and Washington Supreme Court precedent does not now support my conclusion. I conclude that the prosecution committed misconduct, but that the misconduct was harmless error.

Right to Remain Silent

During a CrR 3.5 hearing, Detectives Jeff Barrington and Craig Wendt testified to the following facts as to their initial contact with Joshua Mobley. The pair went with Sergeant Troy Teigen to the Mobley residence's front door. Detective Barrington knocked on the door. Joshua Mobley opened the front door. On the one hand, Barrington concluded that Mobley immediately appeared nervous with the presence of all the officers, including two patrol officers, in the yard. On the other hand, Detective Wendt surmised that Mobley appeared "'non-caring'" at the presence of law enforcement officers. Report of Proceedings (RP) (Apr. 25, 2019) at 163.

Detective Jeff Barrington identified the trio at the front door as police detectives and asked Joshua Mobley if they could speak to him and his wife. Joshua Mobley replied to Detective Jeff Barrington with words to the effect that he was busy getting ready to work, and Mobley asked if the officers would speak to him another time.

Detective Jeff Barrington told Joshua Mobley of the importance of speaking about C.H. According to Barrington, Mobley's eyes then opened wide. He fidgeted. He started mumbling. Mobley asked what was wrong with C.H. Barrington concluded Mobley did not want to speak to law enforcement officers.

Either Jenifer Mobley or Joshua Mobley invited the three police officers inside the residence. Detective Jeff Barrington then explained that baby C.H. had died. Joshua Mobley immediately replied that maybe he should speak with his attorney. Mobley turned flush and then pale.

On Joshua Mobley exercising his right to consult an attorney, Detective Jeff Barrington immediately arrested Mobley. Detective Barrington arrested Mobley because Barrington believed Mobley killed C.H. During the confrontation with the law enforcement officers, Mobley provided no new information that weighed on Barrington's conclusion that Mobley killed C.H. One should reasonably conclude that the officers came to the Mobley's abode with the purpose of arresting him and the officers delayed the arrest with the hope of garnering an inculpatory statement.

After the CrR 3.5 hearing, the trial court entered, in part, the following findings of fact, conclusions of law, and order:

### FINDINGS OF FACT

. . . .

2. After Detective Barrington knocked on the door, Mr. Mobley answered the door. When Detective Barrington identified himself as law enforcement, Mr. Mobley made a statement to the effect that he was busy getting ready for work or taking the children to school. The exact statement

2

by Mr. Mobley does not change the intent of the statement or impact the Court's ruling.

3. Detective Barrington testified that based on this interaction, it was obvious to him that Mr. Mobley wanted nothing to do with law enforcement.

. . . .

7. When Mr. Mobley was informed that C.H. had passed away, he said something to the affect [sic] of "maybe I should speak to an attorney." At this point, law enforcement arrested Mr. Mobley.

### CONCLUSIONS OF LAW

. . . .

3. As it relates to Mr. Mobley's initial contact with law enforcement at the Mobley residence on the morning of February, 27, 2017, the Court concludes that Mr. Mobley was not in custody and that any statements he made were voluntary, and therefore admissible pursuant to CrR 3.5.

4. Although Mr. Mobley's statements are admissible under CrR 3.5, the State may not comment upon, or otherwise elicit evidence of, Mr. Mobley's invocation of his right to remain silent and right to counsel. As such, the Court will disallow any such questions or argument at time of trial.

5. The State may elicit testimony from fact witnesses (Detective Barrington and Detective Wendt) regarding their observations that Mr. Mobley appeared nervous and what they observed that caused them to so conclude. However, the State may not elicit testimony, and no witness may make a conclusion, that Mr. Mobley did not want to speak with police and did not act as would be expected when approached by the detectives. For example, Detective Barrington may not testify that it was obvious Mr. Mobley did not want to talk to them and was therefore nervous. Additionally, Detective Wendt may not testify that based upon Mr. Mobley's demeanor, he did not act like most people the police come into contact with.

### ORDERS

. . . .

1. The State is PROHIBITED from commenting upon Mr. Mobley's invocation of his right to remain silent and right to counsel.

Clerk's Papers at 1177-80.

The trial court's order did not distinguish between Joshua Mobley's prearrest and postarrest silence. The order also did not discriminate between Mobley's comment that he was too busy to talk and his remark that he wished to speak to an attorney. But I conclude that the order only prohibited commenting on Mobley's prearrest expression of a desire to speak with an attorney and Mobley's postarrest silence. Conclusion of law 3 allowed the State to admit statements uttered by Joshua Mobley before his arrest. Conclusion of law 4 repeated the authorization for the State to admit Mobley's comment about not wishing to speak with detectives that the morning and to defer any communications until later. So when conclusion of law 4 later bars the State from otherwise asking questions or from argument about Joshua Mobley's invocation of his right to remain silent, the trial court must have limited the invocation of this right to the time when Mobley later stated he wished to speak with his attorney. Conclusion of law 5 precluded a witness from testifying to the witness' conclusions that Joshua Mobley desired to remain silent and that Mobley failed to act as expected of an innocent person. Nevertheless, conclusion 5 did not bar the State from arguing that Mobley's statement of being too busy to talk was evidence of guilt.

During trial, Detective Jeff Barrington testified, without objection from the defense, to Joshua Mobley's comment that he was too busy to speak with the Spokane Police Department detectives. No officer testified to Mobley's declaration that he wished to speak to an attorney.

During closing, the State's attorney argued:

4

> Now, there are two people, according to the medical examiners who could have done this [caused C.H.'s death]. Because we can't pin down exactly when the fatal blows were administered, when he [C.H.] was shaken, okay, so we have to look for *clues* as to who did this. Okay?
>
> . . . .
>
> Now, the other *clue* is from Mr. Mobley himself when contacted by law enforcement. First, he says—remember, they introduced themselves, hi, we're with the police department. Oh, can we do this later, I'm too busy. What, if anything, strikes you about the first words that come out of this man's mouth? They hadn't even told him why they were there yet, and he's already saying he's too busy.
>
> Then he starts looking around, and when he finds out it's about [C.H.] dying, what does he do? Grabs the baby as a shield, maybe because he's glad his own son is alive. He turns white.
>
> . . . .
>
> . . . But we have lots of circumstantial evidence, all the *clues*, the breadcrumbs of *clues* that lead to Josh Mobley as the person who inflicted the fatal blow.

RP (June 25, 2019) at 2182, 2197, 2205 (emphasis added).

This excerpt from the State's closing argument establishes that the State directed the jury to use as a clue, to Joshua Mobley's guilt, his telling the detectives he was too busy to speak. The State did not suggest that Mobley actually was too busy, but rather mentioned Mobley's response in order to lead the jury to conclude that Mobley did not wish to speak at all because of his guilty conscience. In other words, the State wanted the jury to convict Mobley in part on his exercising a right to remain silent.

For decades, the Washington Supreme Court held that the State may not invite the jury to infer guilt from the accused's exercise of the constitutional right to remain silent, even if the exercise of the right occurred before an arrest. *State v. Burke*, 163 Wn.2d 204, 206, 181 P.3d 1 (2008); *State v. Clark*, 143 Wn.2d 731, 764, 24 P.3d 1006 (2001); *State*

*v. Easter*, 130 Wn.2d 228, 238-39, 992 P.2d 1285 (1996). The Washington Supreme Court has never expressly renounced this principle of criminal law. The State could use the accused's prior silence if the defendant testified, but only as a means of impeaching the accused, not in order to infer guilt. *State v. Lewis*, 130 Wn.2d 700, 706 n.2, 927 P.2d 235 (1996).

The Washington Supreme Court based its rulings prohibiting the State from commenting on the accused's silence on the United States Constitution's Fifth Amendment and United States Supreme Court decisions interpreting the Fifth Amendment. *State v. Burke*, 163 Wn.2d 204, 206 (2008); *State v. Easter*, 130 Wn.2d 228, 235. The Fifth Amendment reads that no person "shall be compelled in any criminal case to be a witness against himself." The United States decisions, on which the state Supreme Court relied, include *Doe v. United States*, 487 U.S. 201, 213, 108 S. Ct. 2341, 101 L. Ed. 2d 184 (1988); *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); *Hoffman v. United States*, 341 U.S. 479, 485-86, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). Washington Constitution article I, section 9 declares that "[n]o person shall be compelled in any criminal case to give evidence against himself." The Washington Supreme Court has never read the state constitutional provision to afford greater protection than the federal constitution. *State v. Easter*, 130 Wn.2d 228, 235 (1996); *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). Joshua Mobley does not advocate a broader reading.

In *Salinas v. Texas*, 570 U.S. 178, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013), the United States Supreme Court reversed course and held that the Fifth Amendment does not bar introduction of a defendant's prearrest silence as evidence of guilt unless the accused expressly invokes the right. Because Washington Supreme Court jurisprudence follows the nation's high court's ruling on the right to remain silent, this court, in *State v. Magana*, 197 Wn. App. 189, 195, 389 P.3d 654 (2016), ruled that the State may now use prearrest silence as evidence of guilt.

Sound reason exists to apply the state and federal constitutions' privilege against self-incrimination to an accused's silence in response to a law enforcement officer's questioning before an arrest of the accused. An accused holds no obligation to respond to questions asked by a law enforcement officer. In *State v. Easter*, 130 Wn.2d 228, 239 (1996), the Washington Supreme Court noted that, if the State could introduce statements uttered by the accused before arrest, the State would delay the arrest and the reading of the *Miranda* warnings to gain the opportunity to use prearrest silence as evidence of guilt. Detective Jeff Barrington delayed the arrest of Joshua Mobley for this reason.

Prearrest silence should not only be constitutionally protected, but such silence should be excluded because of a lack of relevance. In *United States v. Hale*, 422 U.S. 171, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975), the nation's high Court held that an accused's silence during a police interrogation lacked a significant probative value so that any questioning during trial in an attempt to impeach his alibi carried with it an

intolerably prejudicial impact. The Supreme Court thereby affirmed the Court of Appeals' reversal of William Hale's conviction for robbery and grant of a new trial.

In *United States v. Hale*, the United States Supreme Court observed that, in most circumstances, silence is so ambiguous that it is of little probative force. A variety of reasons may influence the accused's decision to remain mute. Under emotional and confusing circumstances, a suspect may not hear or fully understand the question or may have felt no need to reply. The accused may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere when confronted by an accusatory law enforcement officer. Moreover, evidence of silence holds a significant potential for prejudice. The jury may assign much more weight to the accused's previous silence than warranted. Permitting the defendant to explain the reasons for his silence will unlikely overcome the strong negative inference that the jury draws from the fact that the suspect remained silent when accused.

Washington follows the rule that prearrest silence should usually be barred from evidence because of its low probative value and high potential for undue prejudice. *State v. Burke*, 163 Wn.2d 204, 214 (2008); *State v. Easter*, 130 Wn.2d 228, 235 n.5 (1996). In *State v. Burke*, 163 Wn.2d at 219, the Washington Supreme Court echoed the comments of the United States Supreme Court in *United States v. Hale*. The state Supreme Court added other reason for declining the opportunity to speak to law enforcement. The confronted individual may recognize he is under no obligation to speak. The individual may react to a natural caution that arises from his knowledge that anything he says might

be later used against him at trial or based on a belief that efforts at exoneration would be futile under the circumstances.

Joshua Mobley did not expressly ask the trial court to exclude, under ER 402 and 403, his statement of being too busy to talk. Mobley does not contend on appeal that the trial court committed evidentiary error.

### False Choice

Joshua Mobley contends that the prosecuting attorney, during summation, committed misconduct when he presented the jury with a false choice and told them that they must determine that Crystal Henry lied in order to acquit Mobley. To resolve a claim of prosecutorial misconduct, we first inquire whether the prosecutor made improper comments, then, if such comments were made, we inquire as to whether they were prejudicial to the defendant. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). Joshua Mobley bears the burden of proving that the prosecuting attorney's remarks were improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

When evidence contradicts a defendant's testimony, the prosecutor may argue that the defendant lied and that controverting witnesses told the truth. *State v. McKenzie*, 157 Wn.2d 44, 59, 134 P.3d 221 (2006). Nevertheless, the State may not argue that a jury must find that the State's witnesses lied or are mistaken in order to acquit a defendant. *State v. Fleming*, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996). Such an argument poses a false choice since a jury could conclude it does not know who told the truth and thereby acquit the accused because the State failed to meet its burden of proof beyond a

9

reasonable doubt. A jury could acquit the defendant of the crime even though it never finds that the accusing witness lied or misspoke.

A prosecutor may not present a false choice to the jury. *State v. Miles*, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007). To the extent the prosecutor's argument instructs the jurors that they could find the accused not guilty only if they believed his evidence, the prosecuting attorney commits misconduct. *State v. Miles*, 139 Wn. App. at 890.

In *State v. Fleming* the prosecutor stated during closing argument:

> "Ladies and gentlemen of the jury, for you to find the defendants, Derek Lee and Dwight Fleming, not guilty of the crime of rape in the second degree . . . you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom."

*State v. Fleming*, 83 Wn. App. at 213 (emphasis omitted). This court determined that the prosecutor's argument misstated the law and misrepresented both the role of the jury and the burden of proof. The jury would not have need to find that a victim was mistaken or lying in order to acquit.

In *State v. Miles*, 139 Wn. App. 879 (2007), the prosecutor told the jury that the versions of events presented to them were mutually exclusive. The prosecutor further intoned:

> If the State's witnesses are correct, the defense witnesses could not be and vice versa.

*State v. Miles*, 139 Wn. App. at 889. The prosecutor told the jurors that they heard two conflicting versions of events and they must determine which version of events was more

10

credible. The court held that the prosecutor committed misconduct. The jury could conclude that it did not necessarily believe Nathaniel Miles or his witness, but not be satisfied beyond a reasonable doubt that Miles was the person who sold the drugs.

During rebuttal summation, Joshua Mobley's prosecuting attorney intoned:

> The evidence does tell us there are only two people that had access, the time, and the opportunity to kill [C.H.]. One of those persons is Crystal Henry. The other is Joshua Mobley. One of those people testified truthfully, and the other did not. As [C.M, Joshua Mobley's daughter] stated when she was on the stand, somebody is lying. It will be your job, as jurors, to decide who is telling the truth and who is not.

RP (June 25, 2019) at 2244.

The prosecuting attorney, during his summation, did not simply address the credibility of Crystal Henry and Joshua Mobley. The State's attorney told the jury that it must decide who is telling the truth. Although the State did not expressly utter the words "you must find Henry to have lied to acquit," counsel's comments strongly implied that it could not acquit Mobley without determining that Henry prevaricated. The prosecuting attorney told the jury that its job was to determine who told the truth. Since the jury's sole duty was instead to determine if the State proved its case beyond a reasonable doubt, the prosecutor's argument implied that they could acquit Mobley only after determining who told the truth. The State thereby indirectly imposed a burden on Mobley to prove Henry to be a liar. The State diminished Mobley's presumption of innocence and lessened its burden to prove guilt beyond a reasonable doubt.

11

The State emphasizes that its attorney immediately followed her comments by reading the jury instruction that the jury judges the credibility of the witnesses. The State adds that the deputy prosecutor did not state anyone was untruthful during trial but rather reminded the jury of C.M. s testimony that someone was lying regarding the death of C.H.

The State's argument is false. The prosecuting attorney expressly stated that someone was lying and, throughout argument, repeatedly implied that the "someone" was Joshua Mobley. The State never attacked the credibility of Crystal Henry. Reminding the jury of their role in judging witness's credibility only exacerbated the State's misconduct in telling the jury that its job was to decide who was telling the truth.

If a court finds that the prosecution committed prosecutorial misconduct, the court must next measure the extent of the misconduct for the purpose of determining whether to reverse the convictions. Joshua Mobley's trial counsel failed to object to the misleading comments of the prosecutor.

To prevail on appeal on a claim of prosecutorial misconduct when the defense objected below, the accused must show that the prosecuting attorney's comments were prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). If defense counsel failed to object to the misconduct at trial, the defendant on appeal must show more than some prejudice. The court considers the claim of prosecutorial misconduct waived on appeal unless the misconduct is so flagrant and ill intentioned that it evinces an enduring prejudice the trial court could not have cured by an instruction. *State v. Loughbom*, 196

12

Wn.2d 64, 74, 470 P.3d 499 (2020); *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

Despite the ill intentioned standard, our Supreme Court has directed us not to delve into the mind of the prosecutor. The Supreme Court has written thrice that we should not focus on the prosecutor's subjective intent in committing misconduct, but instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection. *State v. Loughbom*, 196 Wn.2d 64, 75 (2020); *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015); *State v. Emery*, 174 Wn.2d 741, 762 (2012).

In other circumstances, this court has deemed a prosecutor's erroneous argument to be ill intentioned, flagrant, and unamenable to correction by a curative instruction when a Washington court previously recognized those same arguments as improper in a published opinion. *State v. Johnson*, 158 Wn. App. 677, 685, 243 P.3d 936 (2010); *State v. Fleming*, 83 Wn. App. 209, 213-14 (1996). I already discussed *State v. Fleming*. The prosecuting attorney told the jury that, to acquit the defendants of rape, the jury must find that the victim lied or was confused. This court held the misconduct to be flagrant because the prosecutor uttered the argument two years after an opinion proscribing the argument. The court reversed the convictions. In *State v. Johnson*, 158 Wn. App. 677 (2010) and *State v. Miles*, 139 Wn. App. 879 (2007), this court reversed convictions

13

when the prosecuting attorney told the jury it must decide who told the truth or the jury must disbelieve the defendant in order to acquit him.

The majority, when concluding that a curative instruction would have sufficed, relies on *State v. Emery*, 174 Wn.2d 741 (2012), wherein the prosecuting attorney told the jury that it must arrive at a reason for doubting the accused's guilt and that it must speak the truth. The state high court refused to reverse because of the lack of an objection to the misstatement. Mobley's prosecutor instead presented a false choice, not a fill in the blank argument. The prosecuting attorney told the jury that it must resolve who told the truth between the victim and the accused, not to speak the truth.

The law may hold confusion as to whether, if a court holds prosecutorial misconduct to be ill intentioned and unable to be cured by a jury instruction, the court ends its analysis or proceeds to also ask whether the misconduct was prejudicial. Stated differently, there may be some confusion as to whether the question of prejudice is subsumed in the question of whether a jury instruction can cure the misconduct.

The Washington Supreme Court recently held that the prosecuting attorney committed misconduct by invoking the war on drugs during a drug prosecution. *State v. Loughbom*, 196 Wn.2d 64 (2020). The defendant had not objected to the prosecutor's comments during trial. The high court stated it would consider a broad context, such as the frequency of improper comments, the intended purpose, the subject, and the type of case to determine whether incurable prejudice occurred. The court declined to analyze

14

the evidence to assess whether the State presented overwhelming or convincing proof of guilt.

When the defendant objects to improper comments of the prosecutor, the court determines prejudice by analyzing whether there is a substantial likelihood that the prosecutor's comments affected the jury's verdict. *State v. Thorgerson*, 172 Wn.2d 438, 442-43 (2011). In turn, the court reviews, among other factors, the evidence presented. *State v. McKenzie*, 157 Wn.2d 44, 52 (2006); *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). Since the defense should carry a higher burden to reverse a conviction when the defense raised no objection at trial, one would expect that the court should not reverse if it deems the State's evidence convincing. In such an instance, the ability of a jury instruction to cure should become irrelevant.

I do not wish to excuse the prosecutorial misconduct, but I decline to find reversible error in this appeal. The prosecuting attorney only told the jury once that its job was to determine who was telling the truth. There were only two possible culprits. The evidence against Joshua Mobley was strong, if not overwhelming.

I concur.

_Fearing, J._
Fearing, J.

15