# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  57806-9-II |
| Respondent, | |
| v. | |
| ROBERT JAMES CONWAY, JR., | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Robert J. Conway Jr. appeals his conviction for rape in the second degree. Conway claims that the trial court violated his rights to present a defense and to confront adverse witnesses when it excluded potential impeachment testimony.  Conway also alleges 11 instances of prosecutorial misconduct in the State's closing argument.  Relatedly, Conway claims he received ineffective assistance of counsel when his defense counsel did not object to the prosecutor's alleged misconduct.  In addition, Conway argues that his judgment and sentence improperly included a reference to his vacated conviction for fourth degree assault with sexual motivation and that certain legal financial obligations should be stricken from his judgment and sentence.

We affirm Conway's conviction for rape in the second degree.  But we remand Conway's judgment and sentence for the trial court to strike (1) all references to his vacated assault conviction, (2) the DNA collection fee, and (3) the community custody supervision fees.  On

remand, the trial court should also determine whether Conway is indigent for the purposes of imposing the VPA.

FACTS

In August 2019, E.P. reported to law enforcement that her ex-boyfriend, Conway, sexually assaulted her. Following an investigation, the State charged Conway with rape in the second degree and assault in the second degree with sexual motivation. The case proceeded to a jury trial.

I. TRIAL TESTIMONY

A. E.P.'S TRIAL TESTIMONY

E.P. testified in detail about the rape. She explained that on the night of the rape, she and Conway were in a relationship and she had agreed to spend the night at his house. That evening, the two of them engaged in consensual sexual acts, including digital-vaginal penetration. E.P. explained that after these consensual acts, Conway raped her. Without her consent, he forced his penis inside her vagina—even though E.P. had told him to stop and was trying to push him off. She recounted that during the rape he held her down with "his arm over [her] shoulder and neck." 2 Verbatim Rep. of Proc. (VRP) at 447. E.P. testified that she was in shock of what was happening to her; she "start[ed] to get blurred vision," became very anxious, and "was having a really hard time breathing." 2 VRP at 448.

After the rape, E.P. told Conway she was leaving and drove to meet up with her sister, Lauren,[1] who was at their friend S. Leone's house. E.P. recalled that when she arrived at Leone's house, she initially told Lauren and Leone that she did not want to talk about what happened. She

---

[1] We refer to Lauren by her first name because she shares the same last name as E.P. No disrespect is intended.

said that she felt "gross" and "disgusted" and went straight to the bathroom to shower. 2 VRP at 450. But after showering, E.P. told both Lauren and Leone about the rape.

E.P. testified that after she explained what happened, Lauren and Leone convinced her to text Conway to see if he would say anything to incriminate himself. So around 2:00 a.m., E.P. texted Conway with the message that she had made it to Leone's house. Conway replied relatively quickly and said that he was sorry and did not want to lose her. E.P. responded that she wanted to end things, and then she blocked his phone number.

After this text exchange, Lauren and Leone took E.P. to the hospital to get a rape kit done. E.P. was examined first by emergency room providers and then by a Sexual Assault Nurse Examiner (SANE nurse). The providers gathered evidence from her body.

E.P. testified that she initially was unsure about whether she wanted to report her sexual assault to the police but she ultimately decided to report it one month later.

B.  LAUREN'S AND LEONE'S TRIAL TESTIMONY

E.P.'s sister Lauren testified that when E.P. arrived at Leone's house that night, E.P. was crying and looked "[d]istraught" and "upset." 2 VRP at 528. It was not until after E.P. took a shower that she explained to Lauren and Leone what had happened. The three of them then went to the hospital so that E.P. could get a rape kit done.

During cross-examination, Lauren testified that she was present when E.P. was getting examined by different medical professionals. She testified that she understood that E.P. also received a pill that would prevent pregnancy.

Defense counsel then raised the issue of who told E.P.'s (and Lauren's) mother that E.P. had been raped. Lauren responded that she "[did not] remember" whether she or E.P. told their

3

mother. 2 VRP at 535. Then, as defense counsel appeared to be attempting to impeach Lauren by asking her about prior inconsistent statements she may have made on this issue, the trial court quickly excused the jury and asked defense counsel to explain why it was relevant whether it was E.P. or Lauren who told their mother about the rape. Defense counsel responded that their theory was that E.P. was either lying or mistaken about whether Conway put his penis inside her. But that once E.P. told her story to Lauren, and once Lauren told their mother, E.P. would have felt pressure to hold to the story that Conway raped her even though it was untrue. Defense counsel stated that it was important that the jury know that it was Lauren, not E.P., who told the mother because "the sister [was] moving this along; [was] escalating it." 2 VRP at 547.

The trial court said even if the defense's theory was correct, the issue of who told the mother that E.P. was raped was irrelevant, and whether Lauren made a prior statement that was inconsistent with her trial testimony was a collateral issue. The trial court prevented further impeachment of Lauren, explaining,

> But in this case it doesn't matter because the question is did mom know? [Lauren]'s not saying mom didn't know. She's just saying I don't remember telling her.
>
> . . . .
>
> All that needs to—all that anybody needs to know is that [E.P.'s] sister and her mother were aware of her claims. It doesn't matter how they found out.

2 VRP at 546-47.

Leone testified next, and her testimony about the events after E.P. came over to their house that evening was consistent with Lauren's, including E.P.'s initial demeanor, going to the hospital,

4

and the order in which these events occurred. Neither Lauren nor Leone testified about the details of what E.P. told them about the rape.[2]

C. TESTIMONY FROM TREATING MEDICAL PROFESSIONALS AND FORENSIC SCIENTIST

The medical providers who examined E.P. took the stand. Missy Griffith Carter was the emergency room provider who first examined E.P. She testified that according to her notes, E.P. reported that "a male individual held her down and strangled her by the neck and forced her to have vaginal intercourse," but that E.P. was unsure whether the person ejaculated inside of her. 2 VRP at 574. Carter also testified that during the examination, E.P. asked for medications to prevent sexually transmitted diseases. Carter noted that E.P. was tearful during the exam.

Heather Vargas-Lyon, a SANE nurse and the second provider to examine E.P., explained the process of completing a rape kit and how forensic evidence is collected from a patient. Part of the preparation for an exam is to review the notes of the social worker who interviews the patient beforehand. Vargas-Lyon testified that in E.P.'s case, the social worker's note said that "when [E.P.] was being strangled or choked that one hand was around her neck and the other one she was being pushed—her shoulder pushed down." 3 VRP at 921.

Vargas-Lyon also read from her own notes about what E.P. told her that night:

I was a virgin, and I agreed to come over to his house if we didn't have sex or take our clothes off. . . . We were touching each other. He had his fingers inside my vagina, then I felt pain. Then really bad pain. I thought at first it was his fingers, but it was his penis inside me. I pushed him off, and he stopped. Then he forced himself into me again. He started choking me. I couldn't breathe. I almost passed out. I thought I was going to die for a second. I was able to get into the bathroom, and then I left and drove to my friend's house.

---

[2] In a pretrial in limine ruling, the trial court decided that Lauren and Leone could not testify about E.P.'s statements about the rape, apparently determining that it would be cumulative and would not qualify as "prior consistent statements." 1 VRP at 81.

2 VRP at 610-11. She had also noted that E.P. had a "sad affect" and was "tearful at times when talking about sexual assault." 2 VRP at 610.

Vargas-Lyon testified that during the exam she took DNA samples from E.P. by taking swabs from E.P.'s anus, inside and outside of her vagina, her skin, her mouth, and taking samples of her blood and pubic hair. She described the contents of the rape kit and confirmed that she followed the written instructions about how to gather each of the DNA samples. While typically a rape kit involves taking two swabs of the inside of a patient's vagina, Vargas-Lyon confirmed that she only took one swab from E.P. because "[s]he was in a lot of pain" and "was grimacing and tensing her body when [Vargas-Lyon was] taking those swabs." 2 VRP at 634. E.P.'s rape kit, with the instructions, was admitted into evidence as State's exhibit 36.

Vargas-Lyon testified that E.P. had a pregnancy blood test done that night and confirmed that E.P. was prescribed lidocaine jelly for her vaginal abrasions and, among other medications, given the pregnancy medication, Plan B. "[S]he was also given a prescription for the first dose of the HIV prophylactic medication." 3 VRP at 926-27.

The forensic scientist who tested the DNA samples taken from E.P.'s rape kit also explained his findings. He said that E.P.'s vaginal and anal swabs tested positive for P30, a protein that is found in high levels in semen, but that her perineal swabs did not show any indication of P30. The male DNA present in E.P.'s vaginal swabs was compared by another laboratory with a DNA sample that had been collected from Conway, and it was concluded that "neither [Conway] nor any of his paternal male relatives [could] be excluded as the donor of the male DNA" on E.P.'s vaginal swabs. 2 VRP at 723.

D. CONWAY'S TESTIMONY

The defense began its case with Conway taking the stand. Much of Conway's testimony initially paralleled E.P.'s—that they had been dating, that she had agreed to stay the night at his house, that she did not want to have penile sex with him, and that on that evening the two of them engaged in consensual sexual activity together.

But the parallels in the testimony soon ended. Conway denied engaging in any penile penetration of E.P. or forcibly raping her. He explained that he was confused when E.P. said she wanted to leave. According to Conway, all of their activity had been consensual, and he had respected her "boundaries." 3 VRP at 1038. Conway further testified that while he and E.P. were kissing, he would "caress her neck," which involved putting his hands on the side of her neck and "squeez[ing] a little." 3 VRP at 1047.

On cross-examination, the State asked Conway to provide more explanation about squeezing E.P.'s neck. Conway confirmed that he and E.P. would both grab each other's necks putting one hand on the side of their head with "fingers on the back of the neck," "[p]alm towards the front," and "squeeze firmly." 3 VRP at 1050-51. Conway admitted that he did this intentionally to "[s]how intimacy." 3 VRP at 1051.

Conway also discussed text messages that he received after E.P. left that night. Conway testified that he received the message from E.P. saying that she wanted to end things at around 3:00 a.m. or 4:00 a.m. Shortly thereafter, he said he also received text messages accusing him of raping E.P. from Lauren and one of E.P.'s friends (Conway could not recall if it was Leone). He explained he did not respond right away to any of the text messages because he needed time to process what was going on. But around 5:00 a.m., he replied to E.P.'s text with "Ok." Ex. 2. He

7

decided not to respond at all to the other texts because "[he did]n't think there was anything [he] could say to change what was being said." 3 VRP at 1069.

Conway also testified about a conversation that he had with the detective who was investigating E.P.'s sexual assault allegations. Conway said that he admitted to the detective that E.P. came over to his house and that they engaged in "foreplay" on the night of the alleged incident. 3 VRP at 1057. But Conway testified that he did not tell the detective "anything about having [his] hand on [E.P.'s] neck and squeezing." 3 VRP at 1058.

## II. CLOSING ARGUMENTS

### A. THE STATE'S CLOSING ARGUMENT

During the State's closing and rebuttal arguments, the State summarized key aspects of witness testimony and followed each summary with asking the jury what reasonable conclusions they could make from such evidence.

The State started by reminding the jury of evidence collected from E.P.'s hospital visit:

> The direct evidence that you have here is that [E.P.] asked for Plan B at the hospital. And she also asked for things that would prevent her from getting STDs; all right? So that's the direct evidence. What's the circumstantial evidence? What's the reasonable inference that you can take from that? Well, why would [E.P] be doing that unless she had just had sex? Unless she believed that there was possibly semen inside her vagina which had been deposited there by the defendant's penis. I submit to you that there's not really any other explanation for that; at least not a reasonable one. . . .

3 VRP at 1090.

The State went on to reiterate E.P.'s account of the night of the rape and followed that with an appeal about her credibility as a witness.

> He choked her out until her vision started to go black, and she thought that she was going to die. That is an implied threat, and it's forcible compulsion under the law.

So how do you know?  You know the allegation is forcible compulsion, but how do you know that it's true?  Well, we have—[E.P.] was a virgin and did not want to have sex. . . .  We have [E.P.] saying that she tried to move the defendant off of her, the defendant was holding her down, strangling her during sex, and that the sex was very painful.

We also have vaginal injuries which corroborate that pain . . . .  We also have the SANE nurse saying that she could only use one set of the swabs from the vagina.  It was too painful, so she could only do one.

. . . .

We have testimony from the SANE nurse that vaginal injuries are extremely rare.

. . . .

How can you trust [E.P.]; right?  So your jury instructions give a lot of factors.  I think that there's—I counted them off before.  I think that there's nine.

We're going to get to a couple of things here.  The first one is bias. . . .  The next one is reasonableness . . . .

So first off, [E.P.] is not biased. . . .

You've seen the evidence that was collected from her.  You can go ahead and look at it.  State's Exhibit No. 36, I believe, is the sexual assault kit. You can use your own collective experience in reviewing that.  You've heard what it means to get that collected.

3 VRP at 1092-1096.

The State also supported its argument that E.P. was not biased by noting that E.P. did not immediately report the rape to the police and that she admitted that some of her sexual activity with Conway was consensual.  The State presented the jury with details of the process she completed at the hospital in order to complete the rape kit and the process of reporting the rape.

She went to the hospital, she had to get her entire body swabbed, her anal cavity, her vagina, the opening of her vagina, her skin, she had to talk to multiple people about—in explicit detail about all the sex acts that she had done, and then she had to come in here and talk to all of you and tell you that the first time that she had sex, it was a forcible rape and she had to recount all of that on the stand.  She's

9

gotten no benefit from reporting this. This is not fun to her. She told you this because it happened.

3 VRP at 1096.

Next, the State described how Lauren, Leone, and the medical providers at the hospital all noted that E.P. was upset and crying on the night of the rape. The State also asked the jury to reflect on E.P.'s demeanor during the trial.

> You have [E.P.'s] demeanor on the stand; okay? And really, this is just up to you; right? And it's up to you whether the emotion that she displayed when she had to talk about this sexual assault, the emotion that she displayed, that [E.P.] displayed when she had to point out the person who had sexually assaulted her, her reluctance to look at him. But it was real. I'll just leave that up to you.

3 VRP at 1097-98.

The State argued that E.P.'s demeanor with her friends, at the hospital, and in the courtroom was consistent with someone who had been raped and that, from this evidence, the jury could infer that E.P.'s version of what happened with her and Conway was reasonable.

Then, the State explained additional ways that E.P.'s testimony was consistent with other evidence.

> I submit to you that [E.P.] remembered things from that time period three years ago and from that sexual assault that you would expect for someone to remember three years later. And we have the consistent statements that [E.P.] made. She reported this to Lauren and to [Leone], and we know that it's not from them, but from the inference of the fact that right after she went over there, they're immediately accusing the defendant of being a rapist; right?
>
> You have the statement that she made to Physician's Assistant Missy Griffith Carter, we have the statements that she made to . . . the social worker from [the hospital] that the defendant was pushing her down with one hand, strangling her with the other hand, and we have heard the statements that she made to Nurse Heather Vargas-Lyon. I'm asking you to find [E.P.] credible for all those reasons.

3 VRP at 1098.

Next, the State reminded the jury that although Conway admitted at trial to squeezing E.P.'s neck, he did not disclose this to police when they initially questioned him.

> [Conway] knew, the defendant knew that he was being investigated for forcible rape, sexual assault. Do you think it's reasonable for the defendant to give the account that he did, recounting many of the things that he said on the stand and to leave out the fact that he put his hand on [E.P.'s] neck and squeezed? I submit to you that the defendant admitted the things that he couldn't deny; right? Because he had evidence that [E.P.] had neck pain, she had redness under her clavicles, that she reported being strangled, and so then he had to come up with a story.
>
> You can also decide whether that was reasonable for him to say that he just decided out of the blue that the first time that [E.P.] let him touch his—touched penis, he decided that he was just going to put his hand on her neck and just squeeze apparently without any intent to do anything other than squeeze. I submit to you that it's not.

3 VRP at 1099-1100.

B. THE DEFENSE'S CLOSING ARGUMENT

During the defense's closing argument, defense counsel discussed E.P.'s mindset before going over to Conway's house the night of the incident. Defense counsel noted that E.P. had "very limited sexual experience" and that she had a lot of anxiety about sex. 3 VRP at 1108.

Defense counsel reminded the jury that E.P. had told medical examiners that at first, she thought the pain she felt was Conway's fingers, before realizing it was his penis. Defense counsel pointed out that "[t]here was zero information provided at any time during the trial about how— why [E.P.] thought it was [Conway's] penis." 3 VRP at 1110. Further, that "[E.P.'s] lack of understanding about sex and what things feel like, her heightened fear, all of these things caused her to panic." 3 VRP at 1111. Later in their closing, defense counsel commented that the tears that medical providers noted in E.P.'s vagina "could [have been] caused by [a] hand, penis, object, we don't know." 3 VRP at 1117.

11

C. THE STATE'S REBUTTAL CLOSING ARGUMENT

The State began its rebuttal by countering the defense's argument that E.P. was mistaken and that Conway and E.P. did not actually have penile-vaginal intercourse. The State detailed the rape kit process again while holding up the swabs used in the kit from exhibit 36.

> And you heard some explanation for potentially some mechanism that the semen could have gotten into [E.P.'s] vagina. There was an ejaculation on her chest, they wiped it off, apparently the argument is he had it on his hand, I guess, and then it got in there. It wasn't detected on the outside of her vagina, but it was detected inside; right? So then why is it in her anus? Why does she have [the protein] P30 in her anus just after she took a shower? She doesn't have it on the outside of her vagina, it's on the perivulvar area. Why does she have it in there?
>
> So I pulled out State's Exhibit No. 36, these are the anal swabs step 14, the steps that [E.P.] had to go through, and it gives directions on how to collect these; right? So you have to have a total of four swabs, you have to lightly moisten two swabs— and I'm reading from this envelope—with distilled water provided. Do not use saline solution. Using one moistened swab at a time, thoroughly swab within the anal folds. Repeat with the second swab.

3 VRP at 1126-27. The State then asked the jury to make inferences from that information, and said that "the only reasonable explanation" for this evidence of Conway's semen inside E.P.'s vagina was that Conway ejaculated in her. 3 VRP at 1127.

Next, the State argued that the only reasonable explanation for E.P.'s behavior when she went to Leone's house, her behavior at the hospital, and for her behavior on the stand was that E.P. was telling the truth and that Conway raped her. The State said,

> I submit to you that the only reasonable explanation that P30 is in there is that the defendant ejaculated in [E.P.'s] vagina, and when he pulled out, it drips down in there. It stayed in there. It wasn't an area that anyone had said anything about being involved in any sexual activity whatsoever.
>
> She took a shower, thereby cleaning the outside of her vagina from any trace of P30. She washed her underwear, but the evidence remained in place that is difficult to clean out. And I challenge you to come up with a more reasonable explanation than that.

12

Out of the things that [defense] counsel said, there's been no explanation for [E.P.'s] demeanor immediately after the sexual assault. No explanation for her demeanor at her friend's house. No explanation for her demeanor at the hospital, . . . and no reason from the evidence that you've seen for her to have the demeanor that you saw on the stand. Nothing. You have no explanation in front of you as to why, after apparently being the perfect boyfriend for months, why allegedly following every single thing that she wanted to do when he was at her house, why she broke up with the defendant at the end of the night. We have no explanation. I submit to you the reason why you don't is because the only reasonable explanation for that is that the defendant did the one thing that he wasn't supposed to do.

3 VRP at 1127-28.

The State then made another appeal to E.P.'s credibility and argued why the jury should

believe her:

Because you've seen [E.P.] get questioned about this for hours. You've seen that. You've seen her get questioned by me. You've seen her hold up on cross-examination for half a day. And during that time, was there anything that caused you to have reasonable doubt as to what she was saying? When was she ever confronted with the statement that was inconsistent with what she told you? I'd submit to you there was not any such occasion.

3 VRP at 1129.

The State made the argument that Conway was not surprised by the accusations of rape he

received from Lauren and Leone's texts:

Why isn't the defendant surprised when he is accused of rape? . . . [E.P.] gets to where she's going, and immediately the defendant starts being accused of being a rapist by [E.P.'s] friends and sister. I submit to you that the only way that you don't respond to those friends with anything or to [E.P.] is if you actually have committed a rape; if you have done the thing you're being accused of.

3 VRP at 1131.

The State ended its rebuttal with a reminder to the jury of its role in the legal process:

Members of the jury, you're either going to believe it or you're not; right? And just like I said at the beginning of this, I can't tell you who to believe, the defense can't tell you who to believe, and not even the judge. I put it all in your hands. Take

13

your jury instructions, review them carefully, review your notes, review the evidence, and I am confident that at the end of this, you're going to come back with verdicts of guilty.

3 VRP at 1132.

Defense counsel made no objections to any of the State's remarks during closing arguments.

III.  VERDICT AND SENTENCING

The jury found Conway guilty of rape in the second degree, and the lesser crime of assault in the fourth degree, with sexual motivation.

The trial court merged Conway's assault conviction with his rape conviction and vacated his assault conviction.  The judgment and sentence was amended to reflect the vacation of the assault conviction, but it still included references that Conway was found guilty of "[a] special verdict/finding of sexual motivation . . . on Count(s) RCW 9.94A.835."  Clerk's Papers (CP) at 230.

The trial court imposed a standard range sentence.  As part of Conway's sentence, the trial court also imposed $500 crime victim penalty assessment (VPA), $100 DNA collection fee, and community custody supervision fees.

Conway appeals.

ANALYSIS

Conway makes five arguments on appeal.  He argues (1) that when the trial court prevented Conway from impeaching Lauren at trial, he was denied his right to present a defense, (2) that preventing this impeachment also violated his right to confront witnesses, (3) that the State committed 11 instances of prosecutorial misconduct during its closing arguments, (4) that he

received ineffective assistance of counsel because his defense attorney failed to object to these instances of misconduct, and (5) that his judgment and sentence must be amended to strike any reference to his assault conviction and to strike the VPA, DNA collection fee, and community custody supervision fees.

I. IMPEACHMENT OF LAUREN AND THE RIGHT TO PRESENT A DEFENSE

Conway argues that the trial court erred in prohibiting him from impeaching Lauren about prior inconsistent statements she may have made about whether she told their mother about the rape. Conway claims that this impeachment was essential to his theory of defense, which was that E.P. felt even more "locked into a claim of rape" and pressured to maintain the lie (or mistaken belief) after her mother and sister found out. Appellant's Opening Br. at 55-56. Thus, when the trial court prevented this questioning, Conway contends the trial court violated his right to present a defense. We disagree.

Analyzing whether a defendant's Sixth Amendment right to present a defense has been violated is a two-step process. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). The first step involves analyzing "the trial court's evidentiary rulings for abuse of discretion." *Id.* Then, even if there was no evidentiary error, the second step involves reviewing whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Id.*

For the first step, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Id.* An abuse of discretion occurs when an evidentiary decision was manifestly unreasonable or based on untenable grounds or reasons. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). When evaluating an evidentiary ruling for abuse of discretion, the reviewing court will consider whether a reasonable judge would rule as the trial judge did. *Id.*

For evidence to be admissible, it must be relevant. ER 402. "Relevant evidence" is defined under ER 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Here, even considering Conway's defense theory, the evidence sought by Conway was not relevant. Arguing that E.P. felt pressure to maintain a story that she either knew to be, or later suspected to be, untrue may be a viable defense theory. And the fact that her mother knew that E.P. said she was raped would be certainly relevant to that theory. But Conway has not persuasively explained that there is any relevance to *how* their mother learned of the rape—any pressure felt by E.P. due to her mother's beliefs would appear to be the same regardless of whether the mother was told by Lauren or by E.P. herself. Indeed, the record shows that the trial court considered Conway's reasoning for attempting to impeach Lauren before ultimately deciding that his line of questioning was irrelevant to the case. Thus, the trial court's decision to exclude the evidence was not based on untenable grounds or reasons. Accordingly, the trial court did not abuse its discretion with its evidentiary ruling.

For the second step—whether the trial court's ruling violated Conway's constitutional right to present a defense—we review the question de novo. *Jennings*, 199 Wn.2d at 58. Although "[a] criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions," that right is not absolute. U.S. CONST. amend. VI; Const. art. I, § 22; *see also Jennings*, 199 Wn.2d at 63. Judges have the discretion to " 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South*

*Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). Only relevant evidence is subject to constitutional protection. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).

Here, as explained above, how E.P.'s mother learned that E.P. was raped had no bearing on the issues for trial, including Conway's defense theory. Accordingly, there was no deprivation of Conway's right to present a defense because there is no protected right for a defendant to present irrelevant evidence. Thus, the trial court's decision to prevent this line of questioning did not deprive Conway of his Sixth Amendment right to present a defense.

II. IMPEACHMENT OF LAUREN AND THE RIGHT TO CONFRONT WITNESSES

In a related argument, Conway argues that the trial court's ruling preventing the impeachment of Lauren about her previous statements of how E.P.'s mother found out about the rape also violated his Sixth Amendment right to confront and cross-examine witnesses.

Related to the right to present a defense, the Sixth Amendment also provides individuals with the right to confront adverse witnesses. U.S. CONST. amend. VI; *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002); *see also State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983) ("The sixth amendment to the United States Constitution and Const. art. I, § 22 grant criminal defendants two separate rights: (1) the right to present testimony in one's defense, and (2) the right to confront and cross-examine adverse witnesses") (internal citations omitted). "The primary and most important component is the right to conduct a meaningful cross-examination of adverse witnesses." *Darden*, 145 Wn.2d at 620. Meaningful cross-examination is essential to ensure witnesses are credible and that the fact-finding process is accurate. *Id.*

While the right to cross-examine is "zealously guarded," it, like the right to confrontation, is limited by considerations of relevance. *Id.* at 620-21. Accordingly, it is within the trial court's discretion to exclude cross-examination that it determines to be irrelevant. *Id.*

Here, as noted above, the testimony would not have been relevant. Thus, Conway's ability to impeach Lauren on this issue was not protected by his right to confront and cross-examine witnesses.

## III. PROSECUTORIAL MISCONDUCT

Conway cites to 11 instances of remarks made by the State during closing arguments and argues they constitute prosecutorial misconduct. We reject all 11 of Conway's claims because the prosecutor's statements were not improper.

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper and, second, that they were prejudicial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Prejudice occurs when " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)).

Even if a prosecutor's alleged misconduct occurs in closing argument, we examine improper conduct given " 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

"[A] prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence . . . . " *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). But "a prosecutor

must 'seek convictions based only on probative evidence and sound reason.' " *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). They cannot make arguments that solely appeal to the passions and prejudice of the jury. *State v. Pierce*, 169 Wn. App. 533, 552, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012). Nor can they misstate the facts in the record or make arguments using extrinsic evidence. *See State v. Teas*, 10 Wn. App. 2d 111, 126-27, 128, 447 P.3d 606 (2019), *review denied*, 195 Wn.2d 1008 (2020).

"The hurdles to obtaining relief based on prosecutorial misconduct are purposefully high." *In re Pers. Restraint of Richmond*, 16 Wn. App. 2d 751, 754, 482 P.3d 971 (2021). We defer to "the trial court's ability to oversee the administration of justice, defense counsel's judgment about whether an objection was worth raising, and a jury's ability to independently assess the merits of the case." *Id.*

When a defendant fails to object to a prosecutor's statements at the trial court level, a waiver is presumed unless the defendant can show that the statements were so flagrant and ill-intentioned that no instruction could have cured them. *State v. Warren*, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008). Our analysis focuses more on whether the prejudice could have been cured and less on whether the prosecutor's misconduct was flagrant and ill-intentioned. *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021), *review denied*, 198 Wn.2d 1041 (2022).

We address each of the 11 instances that Conway contends constitute prosecutorial misconduct in turn.

First, Conway claims that the State argued to the jury that Conway was required to produce an explanation for why E.P. asked for Plan B at the hospital, for why there was semen found on

E.P.'s anal swab, and for E.P.'s demeanor at her friend's house and at the hospital following the rape. These arguments, Conway contends, shifted the burden of proof to him to prove his innocence.

Conway, however, misrepresents the State's argument. Nowhere in the passages Conway cites did the State say, or even suggest, that Conway was required to produce an explanation for this evidence. Rather, the State argued:

> The direct evidence that you have here is that [E.P.] asked for Plan B at the hospital. And she also asked for things that would prevent her from getting STDs; all right? So that's the direct evidence. What's the circumstantial evidence? What's the reasonable inference that you can take from that? Well, why would [E.P.] be doing that unless she had just had sex? Unless she believed that there was possibly semen inside of her vagina which had been deposited there by the defendant's penis. I submit to you that there's not really any other explanation for that; at least not a reasonable one . . . .

3 VRP at 1090. The State further argued in rebuttal:

> I submit to you that the only reasonable explanation that P30 is in there is that the defendant ejaculated in [E.P.'s] vagina, and when he pulled out, it drips down in there. It stayed in there. It wasn't an area that anyone had said anything about being involved in any sexual activity whatsoever.
>
> She took a shower, thereby cleaning the outside of her vagina from any trace of P30. She washed her underwear, but the evidence remained in a place that is difficult to clean out. And I challenge you to come up with a more reasonable explanation than that.
>
> Out of the things that [defense] counsel said, there's been no explanation for [E.P.'s] demeanor immediately after the sexual assault. No explanation for her demeanor at her friend's house. No explanation for her demeanor at the hospital, . . . and no reason from the evidence that you've seen for her to have the demeanor that you saw on the stand. Nothing. You have no explanation in front of you as to why, after apparently being the perfect boyfriend for months, why allegedly following every single thing that she wanted to do when he was at her house, why she broke up with the defendant at the end of the night. We have no explanation. I submit to you the reason why you don't is because the only reasonable explanation for that is that the defendant did the one thing that he wasn't supposed to do.

20

3 VRP at 1127-28.

Taking the prosecutor's remarks in the context of the entire argument, as we must, the prosecutor argued that both the circumstantial and direct evidence, as well as the reasonable inferences from the evidence, supported E.P.'s account of the event and that E.P. was credible. *McKenzie*, 157 Wn.2d at 52. There is nothing impermissible or improper about such arguments. As noted above, prosecutors are given wide latitude to argue reasonable inferences from the evidence. *Lewis*, 156 Wn. App. at 240. The prosecutor did not, contrary to Conway's assertion, tell the jury that Conway was required to offer any explanation for what the evidence showed.

Second, Conway points to the State's argument that characterized E.P.'s testimony as "true" and that she was a trustworthy witness:

> So how do you know? You know the allegation is forcible compulsion, *but how do you know that it's true?* Well, we have—[E.P.] was a virgin and did not want to have sex. . . . We have [E.P.] saying that she tried to move the defendant off her, the defendant was holding her down, strangling her during sex, and that the sex was very painful.
>
> We also have vaginal injuries which corroborate that pain . . . . We also have the SANE nurse saying that she could only use one set of the swabs from the vagina. It was too painful, so she could only do one.
>
>     . . . .
>
> We have testimony from the SANE nurse that vaginal injuries are extremely rare.
>
>     . . . .
>
> *How can you trust [E.P.]; right?* So your jury instructions give a lot of factors. I think that there's—I counted them off before. I think that there's nine. . . .
>
> The first one is bias. . . .

21

3 VRP at 1092-1094 (emphasis added). Conway appears to argue that these remarks presented the jury with a "false choice." Appellant's Opening Br. at 31 Presenting the jury with a false choice refers to when the State argues that in order to acquit defendant or believe his testimony, the jury must find that the State's witnesses are lying. *State v. Vassar*, 188 Wn. App. 251, 260, 352 P.3d 856 (2015); *see also State v. Miles*, 139 Wn. App. 879, 890, 162 P. 3d 1169 (2007). Making such statements is an improper misstatement of the law, the jury's role, and the State's burden of proof. *See Vassar*, 188 Wn. App. at 260-61. But here, the State's remarks did not present the jury with a false choice because the State said nothing about needing to find E.P. to be not credible in order to acquit Conway. When read in context, the State was merely arguing that jurors should make the inference that E.P. is credible because the information from her medical records corroborate her testimony. Thus, the State's remarks were not improper.

Third, Conway points to the State's argument that E.P. was "not biased." The State noted that E.P. did not immediately report the rape to the police and that she admitted that some of her sexual activity with Conway was consensual. The State then said,

> So first off, [E.P.] is not biased. . . .
>
> You've seen the evidence that was collected from her. You can go ahead and look at it. State's Exhibit No. 36, I believe, is the sexual assault kit. You can use your own collective experience in reviewing that. You've heard what it means to get that collected.

3 VRP at 1095-96. Conway appears to contend that the State's argument that "[E.P.] is not biased" was an improper bolstering of E.P.'s credibility. 3 VRP at 1095. Prosecutors generally cannot assert their personal beliefs about a witness's credibility; however, during closing argument, they are given wide latitude to make reasonable inferences about witness credibility so long as those inferences are supported by the evidence. *Warren*, 165 Wn.2d at 30; *Lewis*, 156 Wn. App. at 240.

22

A prosecutor's comments are presumed within the scope of their "wide latitude," and will only be deemed prejudicial if it is " 'clear and unmistakable' that counsel [was] expressing a personal opinion." *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)); *see also Lewis*, 156 Wn. App. at 240. Here, the State supported its argument with the evidence and trial testimony, including that E.P. did not immediately report Conway to the police, that E.P. admitted to some consensual sexual activity, and that E.P. chose to go to the hospital and have a rape kit done. These comments were drawn directly from the testimony, and nothing the State said was a clear and unmistakable personal opinion. Accordingly, the State's remarks were not improper bolstering of a witness.

Fourth, Conway points to the State's description of the process of gathering forensic evidence about an alleged rape during its closing argument and on rebuttal, including graphic detail about the process of anal swabs and the location of the protein, P30, within her vagina. Conway argues that these graphic descriptions were designed to improperly invoke the jury's passions and prejudices. Prosecutors must refrain from using arguments meant to appeal to the jury's passion and prejudice to render a verdict, rather than the evidence presented; however, the State need not water down facts just because they might " 'arouse natural indignation.' " *Pierce*, 169 Wn. App. at 552-53 (State is not "barred from referring to the heinous nature of a crime" or " 'muted because the acts committed arouse natural indignation' ") (internal quotation marks omitted) (quoting *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006)). Here, the State's remarks were an accurate retelling of the testimony of the medical providers. While it is true the details were graphic, they were critical to the State's argument; that is, why would E.P. put herself through the uncomfortable

and sensitive process if she were making up her accusations. As such, the remarks were not an improper inflaming of the jury's passions, but permissible argument tied to the evidence.

Fifth, Conway identifies the passage during the State's closing when the State characterized E.P.'s demeanor on the stand as appearing "reluctan[t]" to look at Conway:

> You have [E.P.'s] demeanor on the stand; okay? And really, this is just up to you; right? And it's up to you whether the emotion that she displayed when she had to talk about this sexual assault, the emotion that she displayed, that [E.P.] displayed when she had to point out the person who had sexually assaulted her, her reluctance to look at him. But it was real. I'll just leave that up to you.

3 VRP at 1097-98. Conway claims these comments asserted facts not supported by the evidence. While the State cannot argue facts not in the record, the State "may argue inferences from the evidence, including inferences as to why the jury would want to believe one witness over another," or a witness's credibility more generally. *State v. Copeland*, 130 Wn.2d 244, 290-91, 922 P.2d 1304 (1996). To argue about a witness's credibility, a prosecutor may comment on a witness's demeanor on the stand, so long as the prosecutor's remarks leave room for the jury to assess the reasonability of the State's inferences and evaluate the witness's demeanor for themselves. *State v. Knapp*, 14 Wn. App. 101, 111 540 P.2d 898, *review denied*, 86 Wn.2d 1005 (1975). Here, the State's inference that E.P.'s demeanor showed that she was reluctant to look at Conway was not unreasonable because the jury also had the ability to observe E.P.'s behavior on the stand. The jurors could readily evaluate whether the State's characterization that E.P. looked "reluctant" was accurate to what they personally saw during trial. Further, the State acknowledged that it was up to jurors to interpret E.P.'s demeanor. Accordingly, this statement was not improper.

Sixth, Conway points to when the State argued that E.P.'s testimony was "consistent" with what she told Leone and Lauren about the rape:

> I submit to you that [E.P.] remembered things from that time period three years ago and from that sexual assault that you would expect for someone to remember three years later. And we have the consistent statements that [E.P.] made. She reported this to Lauren and to [Leone], and we know that it's not from them, but from the inference of the fact that right after she went over there, they're immediately accusing the defendant of being a rapist; right?

3 VRP at 1098. Conway briefly mentions that the trial court ruled in a motion in limine that Lauren and Leone would not be allowed to repeat the specifics of the rape that E.P. reported to them. Conway argues that, given this ruling in limine, the above comments were improper because, coupled with the argument that E.P. was never confronted with inconsistent statements, the State essentially told the jury that Conway had the burden of production to rebut E.P.'s credibility. But notwithstanding the ruling in limine, the State's comments were not improper. The State was not improperly offering specifics of excluded evidence or implying a burden of production; rather, the State was drawing reasonable inferences from admitted testimony, including testimony from Conway about the accusatory texts he received on the night of the rape.

Seventh, Conway cites to when the State claimed,

> [Conway] knew, the defendant knew that he was being investigated for forcible rape, sexual assault. Do you think it's reasonable for the defendant to give the account that he did, recounting many of the things that he said on the stand and to leave out the fact that he put his hand on [E.P.'s] neck and squeezed? I submit to you that the defendant admitted the things that he couldn't deny; right? Because he had evidence that [E.P.] had neck pain, she had redness under her clavicles, that she reported being strangled, and so then he had to come up with a story.

3 VRP at 1099. Conway appears to argue that the State misstated the facts. By characterizing Conway's conduct as "put[ting] his hand on [E.P.'s] neck and squeez[ing]," Conway appears to contend that the State implied that he admitted to putting his hands on E.P.'s actual airway, when there was no evidence that his hands were on the airway. 3 VRP at 1099. But the State never mentioned E.P.'s airway, and Conway's own testimony used nearly identical language (he

25

"squeeze[d] firmly") as used by the State. 3 VRP at 1051. Thus, the State did not misstate the evidence.

Eighth, Conway identifies part of the State's rebuttal argument during which the State commented on E.P. during the questioning at trial:

> [Y]ou've seen [E.P.] get questioned about this for hours. You've seen that. You've seen her get questioned by me. You've seen her hold up on cross-examination for half a day. And during that time, was there anything that caused you to have reasonable doubt as to what she was saying? When was she ever confronted with the statement that was inconsistent with what she told you? I'd submit to you there was not any such occasion.

3 VRP at 1129. Conway appears to claim that these remarks improperly asserted facts that are unsupported by the record. Conway also appears to view these comments, like the comments about E.P.'s "consistency" (discussed above) as showing that the State improperly imposed a burden of production on Conway to rebut E.P.'s testimony. But Conway fails to explain how these remarks are anything other than a permissible argument drawn from inferences from trial testimony and asking the jury to consider their own observations. At the end of the day, the jurors witnessed all of the testimony and were in an apt position to make their own independent determinations of E.P.'s credibility following the arguments of both parties. *Richmond*, 16 Wn. App. 2d at 754 (when considering whether the State's conduct was improper, courts will often defer to jurors' ability to form their own independent assessments). The State's arguments were not improper.

Ninth, Conway cites to the State's comments when it said, "[E.P.] gets to where she's going, and immediately the defendant starts being accused of being a rapist by [E.P.'s] friends and sister." 3 VRP at 1131. Although Conway refers to portions of these comments for other complaints (discussed above), he separately appears to argue that the State's use of the word

"immediately" was factually inaccurate and unsupported by the record. Conway argues that Lauren and Leone did not "immediately" accuse him of rape, but that it actually took several hours before they texted him. We disagree that the State's characterization rises to the level of improper conduct. While the word "immediately" might be an inartful choice of words, it is within the realm of permissible inferences for the purposes of closing argument.

Tenth, Conway points to when the State asked the jury, "Why isn't the defendant surprised when he is accused of rape?" and then argued, "I submit to you that the only way that you don't respond to those friends with anything or to [E.P.] is if you actually have committed a rape; if you have done the thing you're being accused of." 3 VRP at 1131. Conway appears to claim that, with these comments, the State was asking the jury to put themselves in the defendant's shoes. It is true that it is improper for a prosecutor to ask the jury to step into the defendant's shoes. And a prosecutor cannot use first person rhetorical devices to "become the defendant's representative" because it goes "beyond [the prosecutor's] wide latitude in drawing inferences from the evidence by effectively testifying about what particular thoughts [the defendant] must have had in his head . . . ." *Pierce*, 169 Wn. App. at 554-55 (emphasis omitted). Such argument both is outside the evidence and can be an improper inflammatory appeal to the jury. *Id.* at 554. But that is not what the State did with these comments. Arguing to the jury that "the only way you don't respond to those friends is if you've actually committed the rape" is not asking anyone to step into the defendant's shoes and is not the State becoming Conway's representative. 3 VRP at 1131; *see Pierce*, 169 Wn. App. at 554. Rather, these comments were merely observations drawn from reasonable inferences from the evidence and, accordingly, were not improper.

Eleventh, Conway identifies the following passage from the State's closing:

> [Y]ou're either going to believe it or you're not; right? And just like that I said at the beginning of this, I can't tell you who to believe, the defense can't tell you who to believe, and not even the judge. I put it all in your hands.

3 VRP at 1132. Conway claims these remarks improperly presented the jury with a false choice. Presenting the jury with a false choice is generally done when the State argues that a defendant can only be acquitted if the jury finds that the State's witnesses are lying. *See Vassar*, 188 Wn. App. at 260. But Conway mischaracterizes these comments—the State was merely commenting on the jury's role as fact finder, that their job was to evaluate the credibility of the witnesses. The State never tied this role of the jury to the argument that witnesses must be lying to acquit Conway. No false choice was presented.

Because all 11 claims of prosecutorial misconduct were not improper, we do not need to assess whether they could have been cured by an instruction (as Conway failed to object to any of them) or whether the conduct was prejudicial.[3] We reject each claim of prosecutorial misconduct.

IV. DOUBLE JEOPARDY

Conway argues that the trial court erred because his judgment and sentence violated prohibitions against double jeopardy. Conway claims that even though the trial court merged his conviction of assault in the fourth degree with his conviction of rape in the second degree, there remains a reference to his assault charge in the judgment and sentence. The State concedes the error.

---

[3] Conway alternatively argues that if we determine that his claims of prosecutorial misconduct were waived because defense counsel failed to object, we should determine that he received ineffective assistance of counsel. Ineffective assistance of counsel requires a defendant to prove that counsel's performance was deficient and prejudicial to their case. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). But because none of the State's conduct was improper, defense counsel was not deficient for failing to object. Thus, we reject Conway's claim for ineffective assistance of counsel.

An individual cannot be convicted and punished multiple times for the same offense. U.S. CONST. amend. V.; Const. art. I, § 9; *State v. Womac*, 160 Wn.2d 643, 650-51, 160 P.3d 40 (2007). Under double jeopardy, a court cannot "reduc[e] to judgment both the greater and the lesser of two convictions for the same offense or [] conditionally vacat[e] the lesser conviction while directing, in some form or another, that the conviction nonetheless remains valid." *State v. Turner*, 169 Wn.2d 448, 464 238 P.3d 461 (2010) (emphasis omitted). Further, the applicable judgment and sentence must not reference the vacated conviction. *Id.*, at 464-65.

We agree with the parties that any reference to Conway's assault conviction, including any reference to the special verdict finding of sexual motivation that was associated with it, must be removed from his judgment and sentence because the trial court merged this conviction with his conviction for rape in the second degree. Thus, the judgment and sentence must be remanded back to the trial court for this purpose.

V. FEES

Finally, Conway argues that the VPA, DNA fee, and community custody supervision fees must be struck from his judgment and sentence. Conway claims that changes in Washington law and his indigency status support his claim.

The DNA fee and community custody supervision fees are no longer collectable after recent changes to state law. RCW 7.68.035; RCW 9.94A.703(2); LAWS OF 2022, ch. 29, § 8; LAWS OF 2023, ch. 449, §§ 1, 4. The State concedes these recent changes apply, and the DNA fee and community custody supervision fees should be stricken on remand. We accept the State's concession.

As for the VPA, although the trial court determined that Conway was indigent for the purpose of appointing counsel under RCW 10.101.010(3)(d), more is needed for the purposes of waiving the VPA. The trial court must find the defendant indigent under RCW 10.101.010(3)(a)-(c), which specifically excludes being unable to pay the cost of retaining an attorney. RCW 7.68.035. Because the trial court did not make an indigency finding that would support waiving the VPA, we remand for the trial court to make a finding of indigency under RCW 10.101.010(3)(a)-(c), if appropriate.

We remand to the trial court to strike Conway's DNA and community custody supervision fees and for a determination of indigency as applicable for the VPA.

## CONCLUSION

We affirm Conway's conviction for rape in the second degree. But we remand his judgment and sentence to the trial court to strike (1) all references to Conway's assault conviction, (2) the DNA collection fee, and (3) the community custody supervision fees. On remand, the trial court should also determine whether Conway is indigent for the purposes of imposing the VPA.

No. 57806-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

GLASGOW, J.